77 Wn.2d 73 (1969)
459 P.2d 798
KENDALL L. HOWE et al., Respondents,
v.
WASHINGTON LAND YACHT HARBOR, INC., Appellant.[*]
No. 40216.
The Supreme Court of Washington, Department One.
October 9, 1969.
Murray, Scott, McGavick & Graves, by E.K. Murray and Quinby R. Bingham, for appellant.
Reed, McClure & Moceri, by Richard C. Reed and William R. Hickman, for respondents.
DONWORTH, J.[]
This appeal arises from an action brought by respondents Kendall H. Howe and Gladys Howe, husband and wife, against appellant Washington Land Yacht Harbor, Inc. (herein referred to as WLYH). The cause of action is basically in quo warranto to determine the status of lessees in appellant and for a declaratory judgment as to certain questions in relation to appellant.
For a clear understanding of the nature of this action and the relationship of the parties herein involved, it is necessary to summarize the evidence and testimony contained in *74 959 pages of the statement of facts and in the 74 exhibits presented during the proceedings in the 7-day trial. The facts, as summarized, precipitating this cause of action are as follows:
In 1958 a number of Airstream trailer owners interested in caravan trips and frequent get-togethers at regional, national and international rallies organized an unincorporated group called the Northwest Unit of Wally Byam Caravan Club (herein called Caravan Club). The sole common characteristic that can be attributed to its members was that they were owners of Airstream trailers. In 1958 the membership consisted of approximately 50 or 60 Airstream trailer owners.
Sometime in 1959 Mr. Melvin Tveten, a dealer in Airstream trailers and a leader in the Caravan Club, at the behest of Wally Byam, national head of the Caravan Clubs, suggested to the Caravan Club the desirability of obtaining land for a site or base at which members could park their trailers or live in them, which is generally known as a land yacht harbor. Mr. Tveten continued to promote the idea of a land yacht harbor within the Caravan Club until the fall of 1960, when site location and purchase became a matter of general interest and discussion among Caravan Club members. In August, 1960 about 10 members pledged $500 each to aid in land acquisition. It was thereafter decided that those contributing would receive in return for their contribution a 99-year lease for a tract of land within the land yacht harbor. Mr. William Pierce, a Caravan Club member, offered to shoot a moose and donate it to the Caravan Club for a fund raising dinner in order to promote the acquisition of the land yacht harbor. This was done and the dinner was subsequently held on November 16, 1960. The proceeds of the dinner amounted to $444.22.
On November 20, 1960 at a general meeting of the Caravan Club a land acquisition committee was appointed by Dr. Louis West, president of the Caravan Club, to carry through the plans of the membership to acquire a site for a land yacht harbor. Mr. Pierce was selected as chairman of *75 the committee by Dr. West. Mr. Tveten and Mr. Harry York were also appointed to the committee. Thereafter, both Dr. West and Mr. Ralph Fleming, vice-president of the Caravan Club, as well as two other Caravan Club members assisted the appointed committee. Bulletin No. 11 of the Caravan Club, issued on December 16, 1960, stated that the proceeds of the moose dinner had been turned over to the site selection committee.
At the aforementioned general meeting the acquisition of suitable land and the formation of a nonprofit corporation was discussed and noted in the minutes of the meeting as follows:
William Pierce was appointed Chairman of the Land Acquisition Committee, to be assisted by Harry York and Mel Tveten. Mr. Fleming stated that the committee will have to form a non-profit organization, and that he had arranged for an attorney to draw up the articles of incorporation at no cost to the club for his services, but the club would have to pay the filing fees.
A general discussion was held as to who could belong to this corporation, whether it would be just for Northwestern Unit Airstream owners or if other trailer owners would be eligible for membership. After a number of comments, Bill Pierce made a motion that this group go on record as approving the acquisition of land for the use of Airstream trailer owners only, such owners to be members of the Northwestern Unit of the Wally Byam Caravan Club. The motion was seconded by Don Slater, and carried, with only one dissenting vote, being that of Dr. Van Gilder, who stated that he didn't object to acquiring the land but that he felt National Headquarters might intervene and their consent be necessary. Dr. West stated that this matter had been straightened out with National Headquarters, and that our club is an independent club, our only requirement to National Headquarters being to send them their portion of dues collected.
Mr. Fleming stated that it is up to the committee to go out and find the land and make recommendations to the club. He asked that the committee keep the club advised so information can go into the bulletins.
Pursuant to the foregoing instructions at the general meeting, the land acquisition committee investigated a *76 number of sites and finally selected a 43-acre site near Lacey which had a sale price of $7,300. A deposit of $100 was made thereon. The deed to the property was delivered to WLYH on March 16, 1961.
From the date of this meeting until October, 1962, the bulletins of the Caravan Club, sent to all members, kept the members fully apprised of the activities of the WLYH. The message contained therein was to the effect that WLYH was part and parcel a part of the Caravan Club and was incorporated for their use and benefit. Caravan Club members were never advised in those bulletins or in any other way that WLYH was separate from the Caravan Club.
On December 1, 1960 a meeting was held by the land acquisition committee at Mr. Fleming's office. At the latter's request, an attorney, Mr. Douglas Albert, attended the meeting also. Mr. Albert explained that the Caravan Club could not buy land in the state of Washington because it had members in Oregon, Idaho and Montana, and also because it was unincorporated. He suggested that the committee form a corporation which would be owned and operated by the Caravan Club. The minutes of this meeting do not evidence any attempt to create different classes of membership. However, the minutes show that the committee intended that the five principal officers be leaseholders (i.e. those who have contributed or will contribute $500) and that at least five of the nine members of the board of trustees of the new corporation also be leaseholders at the land yacht harbor.
A second meeting was held in Mr. Fleming's office on December 15, 1960. At that time Mr. Albert presented the proposed articles of incorporation and they were approved. Proposed bylaws of the newly-formed corporation were also discussed, but there is no record in the minutes of the meeting showing that they were approved. It was the determination of the trial court, however, that the bylaws were properly approved. This matter, relating to the validity of the bylaws will be discussed later in this opinion. *77 Those in attendance at the foregoing meeting were the committee members and Mr. Albert and one Bob Helgeson. Mr. Albert testified in the trial court that he could remember no other meetings in December except the two discussed above.
The articles of incorporation of this non-profit corporation, which was named Washington Land Yacht Harbor, Inc., were then duly filed on January 5, 1961 with the Secretary of State. The alleged bylaws bear the date of January 6, 1961.
The sole article in the articles of incorporation relating to membership in WLYH was article 3[1] which states:
The membership of this association or corporation shall consist of all of the parties attaching their names as subscribers, and all other members from time to time in good standing in the Northwestern unit of the Wally Byam Caravan Club, or its chartered successor, such membership to be determined by the records of the Secretary of such organization ...
(Italics ours.) The validity of this article was not challenged in the trial court. Despite what appears to be clear language in the foregoing article, indicating that membership was open to the subscribers and all other members in good standing of the Wally Byam Caravan Club's Northwestern Unit, article 2, section 1 of the bylaws, bearing the date of January 6, 1961, denominates two classes of members. That section of article 2 reads as follows:
The corporation shall have two classes of members. The designation of such classes and the qualifications and *78 rights of the members of such classes shall be as follows:
CLASS 1. Resident memberships shall be available to members of the Northwestern unit of Wally Byam Caravan Club, who lease trailer space for a period of time in excess of one year, from said corporation. Resident members shall have full voting rights as hereinafter set forth.
CLASS 2. Associate membership for all members of the Northwestern unit of the Wally Byam Caravan Club, who lease or occupy trailer space for a period of time less than one year. Such members shall pay a parking fee. Associate members shall not be entitled to vote in the affairs of the corporation other than upon such matters as may be pertaining to the rights, status and duties of said association.
The first annual meeting of the WLYH was on October 14, 1961. At that meeting nine members were elected to the board of trustees. The meeting was held in Federal Way and the notice of the meeting, dated September 29, 1961, was sent to all lessees. About this time Mr. Tveten, one of the incorporators of WLYH, saw the bylaws for the first time. On October 17, 1961 the board of trustees held their first meeting and members of the board were given copies of the alleged bylaws. From October, 1961 until about August, 1962 WLYH continued to operate its affairs as if the lessees were the only members of the corporation entitled to a voice in its affairs. However, during this period the bulletins of the Caravan Club covered the activities of WLYH and gave the impression to its members that WLYH was an adjunct of the Caravan Club.
In July, 1962 Delmar Mitchell, president of the Caravan Club and a lessee, learned that Pierce and other lessees were contending that the lessees had the exclusive right to vote and otherwise control the affairs of WLYH independently of the wishes of the Caravan Club. On August 18, 1962 the WLYH held a meeting at Birch Bay the same day as a meeting of the Caravan Club was being held there. Although notice of the WLYH meeting had been sent only to lessees by the WLYH, a large group of non-lessees (members of the Caravan Club) attended the meeting and *79 took it over. Pierce was forced to relinquish control of the meeting and it is unclear from the testimony who conducted the meeting from that point on. A group of lessees joined with the non-lessees in this move.
Following the August meeting, Mr. E. Albert Morrison, a Tacoma attorney, was consulted by Mr. Pierce and by the dissidents. After examining the articles of incorporation and the alleged bylaws, he determined that the bylaws were invalid as they had not been adopted by a meeting of the membership, were in conflict with the articles of incorporation, and contrary to the provisions of RCW 24.04. He recommended that new bylaws be prepared and presented to a legal membership meeting of WLYH. He also suggested that new officers and trustees be elected and that all previous acts of the corporation be ratified.
Mr. Morrison then prepared new bylaws which, while generally following the wording of the January 6, 1961 bylaws, eliminated the afore-quoted article 2, section 1, which provided for two classes of membership and recognized membership in WLYH in any member in good standing of the Caravan Club.[2] A notice of a meeting to be held on October 13, 1962 was then sent to all members as shown on the membership list of the Caravan Club to attend the WLYH meeting in Lacey. A proxy was enclosed to assure the presence of a quorum.
Before the meeting some dissatisfaction arose as to the wording of some of the proposed revisions of the bylaws prepared by Mr. Morrison. However, none of the dissatisfaction related to the deletion of article 2, section 1 of the original bylaws. In any event, two meetings were held in the homes of Dr. West and Mr. Mitchell to discuss possible changes. Among those attending were Dr. West and Mr. R.H. Piercy, two of the original incorporators who had also signed the original articles of incorporation. Respondents, who at the time were non-lessees, also attended and took *80 part in the discussions. They were the only non-lessees in attendance.
Finally, on October 13th, the WLYH meeting was called to order by Pierce, president of the WLYH, who then turned the chair over to Mr. Morrison. Some of those attending the meeting brought along their own prepared set of bylaws in opposition to those drawn up by Mr. Morrison, but the Morrison bylaws prevailed in the vote that followed. The votes of the non-lessees were in the majority due to the proxy votes held by the dissident lessees, Mr. Tveten, Dr. West, Mr. Mitchell and Dr. Donald Jones. In addition, the membership approved an amendment to article 3 of the articles of incorporation (see footnote 1) and they ratified all prior acts of the corporation as it existed prior to October 13, 1962. A new board of trustees was elected and it subsequently met and elected new officers for the corporation. Dr. Jones became the newly-elected president of WLYH.
Following the above meeting Dr. Jones authorized Morrison to prepare new lease agreements. This was done and they were issued to the lessees. During the next year control over WLYH rested with the original non-lessees of the corporation.
In 1963 respondents became increasingly more active in the affairs of not only the WLYH but also the Caravan Club. They had occupied a lot since September 1, 1963 and received a lease on May 14, 1964. They had been non-lessee participants in the activities of WLYH prior to their occupancy of the premises. On May 18, 1963 Mr. Howe presented, explained and moved for the adoption of a number of proposed amendments to the October 13, 1962 bylaws at a membership meeting of WLYH. These amendments had been prepared by a Seattle attorney, Mr. Richard Reed. They were approved by the membership. Mrs. Howe was elected a trustee of the WLYH at this meeting and subsequently, in 1964, she became the treasurer of WLYH. Thereafter, on September 21, 1963, Mr. Howe was elected vice-president of the Caravan Club.
*81 In the spring of 1964 ill feelings again controlled the atmosphere surrounding the WLYH's affairs. On May 3, 1964, at a meeting of the WLYH trustees, Mr. Howe orally suggested to the trustees that the bylaws be amended to provide that after a certain date only lessees would be eligible for membership in WLYH. At the request of the board of trustees, Howe contacted Richard Reed to draft the amendments in light of his suggestion. This was done and the proposed changes were mailed out to all the members of WLYH on May 6th. However, these amendments were never considered by the May 16, 1964 meeting of WLYH as after the date of mailing, a group of past presidents of the Caravan Club solicited proxies from members of the Caravan Club to prevent the leaseholders from making the power play. This presidents' group included Mitchell, West and Jones.
On May 16, 1964, however, Ralph Fleming, the person who had engaged Douglas Albert to draw up the original articles of incorporation, moved for the adoption of a resolution that all the assets of WLYH be sold to the Caravan Club for $1 and that the former incorporation be dissolved. He contended that since the Caravan Club was now incorporated and had substantially identical membership and purposes with the WLYH, there no longer existed a need for two corporations. This motion carried by a vote of 378 to 108 at the membership meeting. Subsequently, three new trustees were elected to 3-year terms on the nine member board of trustees of WLYH, but six holdovers remained from the original board of trustees. On May 22, 1964 the holdover trustees refused to recognize the vote of the membership and failed to comply with the demand to sell. A tie vote of the board of trustees blocked a move by West that WLYH execute and deliver a quitclaim deed to the Caravan Club.
Before proceeding to the merits of this case, a review of the proceedings in the trial court shows the following procedural background leading to this appeal. The original complaint was filed June 11, 1964. It named as defendants, in addition to the Caravan Club and WLYH, six individuals *82 who were alleged to be officers and trustees of the Caravan Club and also representatives of a class who claimed membership in the two corporations. The Caravan Club and the six codefendants answered the complaint admitting most of its allegations, including the adoption of the resolution at the annual meeting of WLYH on May 16, 1964 relating to the proposed sale of its assets to the Caravan Club for $1.[3]
WLYH filed its answer which was verified on July 27, 1964 in which it admitted the allegations of the complaint and asserted a third party claim in which it charged that the officers and trustees of the Caravan Club had engaged in a conspiracy to deprive WLYH of its assets without compensation.
Thereafter there was a change of counsel for WLYH and an amended answer was filed on its behalf which contained no reference to any conspiracy as previously alleged. This change was made with the permission of the trial court. This answer generally supported the position of the Caravan Club.
Respondents in July gave appellant notice that at the trial they would move to amend their complaint by adding to their second cause of action an allegation under the quo warranto statute (RCW 7.56) and request the court to determine the names of the officers and trustees of WLYH.
The trial began August 24, 1965. At that time respondents moved for a voluntary nonsuit as to all named defendants except WLYH and withdrew from the consideration of the court certain portions of their prayer for relief and the issues under their second cause of action (quo warranto) as to the officers and trustees of the Caravan Club.
Over the objection of WLYH the court granted the motion for nonsuit and also denied WLYH's objection to proceeding with the trial on the ground that the granting of this motion for nonsuit left the case with a lack of necessary *83 parties for the determination of the issues presented by the pleadings.
After the conclusion of the trial the court entered numerous findings and conclusions over appellant's objections and refused those proposed by appellant.
It entered a decree in favor of respondents. The effect of the court's findings, conclusions and decree is summarized in appellant's brief as follows:
In these the Court found, concluded and adjudged (1) that there was not a lack of necessary parties, (2) that the By-Laws of W.L.Y.H. adopted October 13, 1962 were invalid, (3) that the Amendment to Articles of Incorporation of W.L.Y.H. filed November 7, 1962, was invalid, (4) that the By-Laws, dated January 6, 1961, with the exception of the provisions thereof creating two classes of membership, were valid, and were the existing effective By-Laws of W.L.Y.H., (5) that such By-Laws were not invalid either (a) as not having ever been adopted at a meeting of members, or (b) as contrary to the provisions of the Articles of Incorporation of W.L.Y.H., or (c) as in conflict with the provisions of R.C.W. 24.04.020, (6) that membership of and the right to vote in the affairs of W.L.Y.H., was confined to those only who held leases from W.L.Y.H., to the exclusion of all others, (7) that the original incorporators of W.L.Y.H. were not acting in a fiduciary capacity for members of the Caravan Club, (8) that plaintiffs by their active participation without objection in the meeting and affairs of W.L.Y.H., and their acquiescence and consent thereto, had not waived the right to and were not estopped to maintain this action, and (9) that the outstanding 99-year leases issued by the W.L.Y.H. were valid. This last item W.L.Y.H., its officers, trustees and counsel have never questioned, and do not here.
In supplementation of its 14 assignments of error, appellant sets forth in an appendix to its brief 25 quoted portions of the trial court's findings of fact to which it excepts and also includes 24 of its proposed findings which the court refused.
The main issue presented by this appeal is: What bylaws, i.e., January 6, 1961 or October 13, 1962, are valid and control the activities of the WLYH? The trial court determined, *84 after taking the matter under advisement following the trial, that the January 6, 1961 bylaws had been validly adopted and that the subsequent bylaws were invalidly adopted. With this decision we are compelled to disagree.
Earlier in this opinion we quoted in part the relevant language in article 3 of the articles of incorporation. The plain and unambiguous language contained therein stated that the membership of WLYH should consist of the subscribers and "all other members from time to time in good standing" (italics ours) in the Caravan Club or its chartered successor. There is no question that this article is valid and was in full force and effect on January 6, 1961, as well as October 13, 1962.
RCW 24.04.020 of the nonprofit corporation act states in part:
The interest of each incorporator or member shall be equal to that of any other, and no incorporator or member can acquire any interest which will entitle him to any greater voice, vote, authority or interest in the corporation than any other member.
[1] It is elementary in this state that the laws of this state, whether constitutional or statutory, enter into and become a part of the articles of incorporation. See State ex rel. Swanson v. Perham, 30 Wn.2d 368, 375, 191 P.2d 689 (1948). This is particularly so where the statute grants or restricts the powers of the corporation. See Bellinger v. West Coast Tel. Co., 54 Wn.2d 576, 579, 343 P.2d 189 (1959).
Article 2, section 1 quoted above of the bylaws certified on January 6, 1961 gives the lessee member greater authority and control over the affairs of WLYH. It created two classes of membership and is clearly in conflict with the provisions of RCW 24.04.020.
In view of the foregoing, we must agree with the trial court's conclusion that article 2 of the bylaws is invalid in that it created two classes of membership, i.e., lessees and non-lessees, and gave greater control to the lessees.
The trial court, however, excised that provision and continued the bylaws in full force and effect without that provision.
*85 [2] In order to even contemplate this excision, the bylaws in the first instance which were allegedly adopted on January 6, 1961 must comply with RCW 24.04.060, and article 3 of the articles of incorporation. In our opinion, the bylaws were not adopted in compliance with either statute or the articles of incorporation.
Article 3 states that the subscribers of the articles and all members in good standing from time to time in the Caravan Club are members of the WLYH.
RCW 24.04.060 states in part:
Bylaws. Before transacting any business or acquiring any property the members of the corporation must meet and adopt bylaws. The vote of a majority of all the members of the corporation shall be necessary to the adoption of such bylaws and when adopted the same must be written in a book to be kept by the corporation.
On January 6, 1961, if the WLYH were to adopt bylaws, it needed a majority vote of the subscribers and the members of the Caravan Club then in good standing. There is no evidence indicating that a general membership meeting was held to consider and adopt the bylaws. The only written evidence indicating that they were even considered, other than the fact that a copy of those bylaws exists, is contained in the minutes of a WLYH meeting convened in the office of Ralph Fleming on December 15, 1960. Therein it is observed that the bylaws were reviewed and that they were signed. Only eight of the incorporators of the corporation to be were in attendance, no vote was recorded, and no mention was made of a meeting at which those bylaws could have been validly adopted by a membership meeting of WLYH prior to that date.
The testimony of attorney Albert stated that he prepared the articles of incorporation and bylaws after the first incorporation meeting on December 1, 1960. Thereafter he presented them to the December 15, 1960 meeting which approved and adopted them. Despite the plain language of article 3 of the articles of incorporation, attorney Albert said he thought the subscribers were the only members in WLYH and, therefore, entitled to approve them. *86 He further stated that he had little or no knowledge, however, of the Caravan Club's original endeavor in setting up the land acquisition committee to find a land yacht harbor. In addition, we find no testimony from any subscriber or member which tends to establish that a meeting was held on or prior to January 6, 1961, the date on which the bylaws were certified.
As a result of the above, it is our determination that the bylaws allegedly certified on January 6, 1961 are void and of no effect as they are in violation of RCW 24.04.060 and article 3 of the articles of incorporation. In our view, there is no evidence to support the trial court's findings of fact as to their validity and, therefore, with no valid bylaws adopted in 1961 there can be no excision of that which does not exist.
As we have discussed earlier in this opinion, the evidence shows that the moving forces behind the October 13, 1962 meeting came both from lessees and non-lessees who were members of both the WLYH and the Caravan Club. Attorney Morrison was retained to straighten out the corporate affairs of WLYH. After analyzing the articles of incorporation and the allegedly valid January 6, 1961 bylaws, he correctly determined that all members in good standing of the Caravan Club, as well as the leaseholders in WLYH, were entitled to vote at a meeting called for the purpose of adopting valid bylaws. Notice of such a meeting to be held was duly sent to all members of WLYH as described in article 3 of the articles of incorporation.
Finally, on October 13, 1962 lessees, as well as non-lessees, approved the Morrison bylaws with a total vote of a majority of the legal membership at that time of WLYH, which due to article 3 of the articles of incorporation included members in good standing of Caravan Club. At attorney Morrison's suggestion that all prior acts of the WLYH be ratified, the membership approved a resolution ratifying the prior acts of WLYH. New officers and a board of trustees were then elected pursuant to the bylaws.
After analyzing the exhibits and recorded testimony, we *87 think there is no doubt that WLYH's corporate house was brought to some semblance of order on October 13, 1962.
After consideration of the foregoing, we are compelled to make the following seven determinations concerning the status of WLYH. They are: (1) All of the subscribers to the original articles of incorporation, plus all members in good standing in the Caravan Club from the date of incorporation of WLYH, are members in good standing of WLYH. (2) Since there was no valid membership meeting to adopt the bylaws certified on January 6, 1961, those proposed bylaws were never approved in accordance with RCW 24.04.060 and are, therefore, null and void. (3) Furthermore, RCW 24.04.020 prohibits any member of a non-profit corporation from having any greater interest than any other member in the corporation. Assuming arguendo that the January 6, 1961 bylaws had been validly adopted pursuant to RCW 24.04.060, article 2 of the January 6, 1961 bylaws would still be void as being in violation of article 3 of the articles of incorporation and RCW 24.04.020. (4) Since the October 13, 1962 meeting was conducted after full notice to all members of WLYH, as described by article 3 of the articles of incorporation, and the bylaws were adopted at that meeting of the WLYH in accordance with RCW 24.04.060, those bylaws are valid. (5) Additionally, since those were the first valid bylaws to be adopted in accordance with RCW 24.04.060, the officers and trustees elected thereunder and their successors are the legally constituted officers and trustees of the WLYH. (6) The subsequent amendments to the articles of incorporation and bylaws, if validly adopted pursuant to the October 13, 1962 bylaws, controlled the operation of WLYH at the time this action was begun. (7) Since, in our opinion, the October 13, 1962 meeting was a legal and valid meeting of the WLYH, its resolution ratifying all past acts of the corporation gives full force and effect to the leases executed by the corporation prior to that date. Any leases thereafter executed pursuant to the articles of incorporation and bylaws are also *88 valid. Appellant in its brief expressly states that it has never, and does not now, question the validity of any of these leases.
In their brief, respondents submit that the basic issue presented by this appeal is:
Can a group of individuals with no legal or equitable interest in an organization bootstrap themselves into a position of selling $100,000 of property belonging to the organization to themselves for $1.00?
However, as this opinion indicates, we disagree with that position for the reason that the testimony presented in the trial court regarding the value of the WLYH property at the time of the trial was incompetent, inconclusive and insufficient to establish the value of the property. Furthermore, the trial court in its judgment and decree stated:
By reason of the conclusions of the Court with respect to the other issues, the question of whether the defendant can sell all of its assets to the Wally Byam Caravan Club-Washington Unit, Inc. for less than fair market value, and whether the objects and purposes of the defendant corporation will be defeated if such corporation ceases to own and operate the Washington Land Yacht Harbor, are moot.
In view of the trial court's disposition of the issue relating to what bylaws controlled the activities of WLYH, we do not reach the question posed by respondent. The trial court entered no findings of fact or conclusions of law regarding the validity of the attempted sale and dissolution of the corporation. Therefore, that issue presented by respondents is not now before us.
Appellant's brief contains 14 assignments of error upon which it relies for a reversal of the trial court's judgment. We do not find it necessary to discuss each one separately in view of the conclusion which we have reached as to the disposition of this appeal.
Accordingly, the judgment and decree of the trial court is reversed and the cause is remanded for a new trial to be *89 conducted consistently with the views expressed in this opinion.
FINLEY, HAMILTON, NEILL, and McGOVERN, JJ., concur.
December 29, 1969. Petition for rehearing denied.
NOTES
[*] Reported in 459 P.2d 798.
[] Justice Donworth is serving as a justice pro tempore of the Supreme Court pursuant to Const. art. 4, § 2(a) (amendment 38).
[1] This article of the articles of incorporation was later amended on October 13, 1962 and filed with the Secretary of State on November 7, 1962. It stated:

Qualifications for membership in this association, conditions for a succession of membership, the manner in which membership shall cease, the mode and manner of expulsion of a member, the termination of a member's interest in the corporate property upon succession of his membership, and whether he shall be remunerated therefor, and if so, in what amount of membership fee, initiation fees, dues, and all other matters pertaining to membership in this association shall be as provided in the By-Laws of this association.
[2] In June, 1963 the Caravan Club was incorporated as a non-profit corporation under the name of Wally Byam Caravan Club-Washington Unit, Inc.
[3] The trial court issued a restraining order forbidding the consumation of the proposed sale pendente lite. This order is still in effect.