[No. 20498-3-II.   Division Two.   September 4, 1998.]

M. SALLY RICCOBONO, *Respondent*, v. PIERCE COUNTY, ET AL., *Appellants*.

---

*John T. Kugler* and *F. Ross Burgess* of *Burgess, Fitzer,
Leighton & Phillips, P.S.*, for appellants.

*Kari Hanson* and *Hugh J. McGavick*, for respondent.

MORGAN, J. — In this unlawful retaliation case, the employer appeals an adverse jury verdict, and the employee cross-appeals the dismissal of certain claims. We affirm in part and reverse in part.

In 1988, Mary Sally Riccobono, a woman of Hispanic origin, was hired as a recording technician by former Pierce County Auditor Brian Sonntag. From the outset, she was both a civil service employee and a union employee. According to civil service regulations and her union's collective bargaining agreement (CBA), she could be removed, suspended, or demoted only for cause.[1]

In January 1993, Cathy Pearsall-Stipek succeeded Sonntag as county auditor. She hired John Gamble as her deputy, and Gamble became Riccobono's supervisor.

On March 19, 1993, Riccobono wrote to her union complaining about various aspects of her employment. Later, she contacted a Pierce County Equal Employment Opportunity officer and made various complaints about her working conditions.

On April 6, 1993, Gamble reprimanded Riccobono, alleging misuse of county telephones and conduct unbecoming a county employee. Two weeks later, Riccobono submitted a grievance to her union and the County. In the grievance, she asked that the County "[d]estroy letter of reprimand

---

[1] PIERCE COUNTY CODE 3.20.040(A); CBA art. 4, § 8.

dated 4-6-93. Remove letter from personnel and all County files. Stop harassment and discrimination."[2]

On May 28, 1993, Riccobono placed an envelope containing a copy of her grievances in the Pierce County Annex mail room, addressed to Sonntag and marked "confidential." According to Riccobono, Gamble intercepted the envelope, opened it, and read its contents. According to Gamble, he intercepted the envelope, but only by mistake; he thought it was an envelope that he himself had placed in the mailroom, and he mailed it from another location when he realized his mistake.

In May, Riccobono prepared a federal EEOC complaint. On June 7, she filed it.

On July 13, Gamble gave Riccobono a "notice of intent to suspend" for three days, alleging behavior that interfered with performance, intimidated other employees, and impaired operations. The next day, Riccobono obtained a medical leave of absence due to stress, and her leave was later extended to August 30. She returned to work on August 30 and served her three-day suspension from September 14 to 16.

On October 7, 1993, Gamble called Riccobono into his office to discuss vacation time. Riccobono said she did not have to listen and walked off the job.

Also on October 7, 1993, Riccobono requested another medical leave of absence. It was granted, and then extended from time to time over the next several months.

On June 30, 1994, Riccobono resigned from her county employment.

On November 23, 1994, Riccobono sued Pierce County and others. Citing RCW 49.60, she alleged that after January 1, 1993, the County had wrongfully retaliated against her because she had actively opposed its attempts to discriminate against her on the basis of her national origin. Later, she amended her complaint to add claims under 42 U.S.C. § 2000e and 42 U.S.C. § 1983.

[2]Ex. 85.

Trial began in December 1995. Riccobono called a certified public accountant, William C. Deaton, on the issue of future economic loss. In addition, she called herself, her ex-husband, a physician, two psychologists, and various other witnesses.

To compute future economic loss, Deaton calculated what Riccobono would have earned from the County had she stayed in its employ, then subtracted what he assumed she would earn by working for other employers in the future. After various adjustments not pertinent here, the result was $299,399, and that, in his opinion, was Riccobono's future economic loss.

In calculating what Riccobono would earn from other employers in the future, Deaton assumed that Riccobono would not work at all until July 1996; that she would earn $7 per hour upon returning to work; and that she would not earn more than $10 per hour during the remainder of her working life, which he thought was 12.1 years. After he had described these assumptions to the jury, the County asked leave to voir dire, which was granted. During the ensuing questioning, Deaton stated that he had no ability to determine whether Riccobono was or was not employable due to a physical, psychological or psychiatric condition. He also said that he was not a vocational rehabilitation expert, and that even if he were, he had not assessed Riccobono from that perspective. In short, he said he was not basing his assumptions on facts within his knowledge.

When the County completed its voir dire, it objected to Deaton's assumptions, claiming that he had no factual basis for making them and that there was nothing else in the record to supply such a basis. Riccobono initially responded that she had been able to work since August 1994; as her counsel put it, she had been "released by Doctor Frank or Doctor Miller in August '94 and became able to return to work, but there was no work to return to."[3] A little later, however, the trial court wondered whether Riccobono was

---

[3]Report of Proceedings at 856.

required to establish "employability or lack of employability before damages can attach?", and asked Riccobono's counsel, "Are you representing to me you're going to tie that up at some point later on in this case[?]"[4] Counsel answered:

> I can assure you that I will have Doctor Van Dragt back here to testify from the time he has treated Sally Riccobono, she has not been employable. I will tell [you] that [ ] I will have Doctor Frank back here to say before August 1994, between October 7 and August 1994, she was not employable, she was a basket case because of the injury she suffered here. There's about a three-month window where she had that release to return to work and got unemployment.[5]

Counsel also stated that Riccobono's ex-husband "will testify that she was unable to do anything,"[6] and implied that Riccobono herself would testify to the same effect.

Dr. Bryan Van Dragt, a psychologist called by Riccobono, took the stand twice, once before and once after the County had objected to Deaton's testimony. The first time, he testified that he began seeing Riccobono in November 1994.[7] He diagnosed dysthymia, formerly called depressive neurosis, and prescribed an intensive therapy program that helped her for two or three months.[8] He thought her prognosis was good if she dealt productively with past events; otherwise, it was not. He thought she would continue in therapy for at least a year or two more,[9] but he was not comfortable giving an opinion on whether she would recover.[10]

---

[4]*Id.* at 858.

[5]*Id.* Dr. Van Dragt and Dr. Frank had each testified once already, without stating the propositions referred to.

[6]*Id.*

[7]*Id.* at 542.

[8]*Id.* at 563-65.

[9]*Id.* at 583.

[10]*Id.* at 590-91.

The second time, Dr. Van Dragt testified as follows:

Q: When Sally Riccobono first came to you for treatment [in November 1994], did you have an opinion about whether or not she was psychologically competent to hold a job?

A: That opinion developed over the course of my working with her. I had no—there was nothing extreme that I observed in her behavior that would have alerted me to anything that would necessarily keep her out of a job.

But in her accounts of her feelings about employment, and there was ample cause for concern about whether or not she was able to hold a job at the time.

. . . .

Q: During the time that Sally Riccobono has treated with you, do you have an opinion about her ability to hold a job?

A: In other words, did I have an opinion of her ability to hold a job during the time I was working with her?

Q: Let me rephrase that. As we sit here today, in your opinion, was there any time where Sally was under your treatment that she was capable of returning to work?

A: Following the intensive [therapy], she exhibited a degree of relief from both the depression and the preoccupation with the events of her recent employment. At that time, I believe it was—it was not too long after the intensive, she was employed for three days. And my observations of her performance and what was going on in her during the time that she was employed for those three days is probably my only direct experience that I could use to answer that question.[11]

Dr. Van Dragt also said he had no idea how long it would take Riccobono to get better,[12] and that he was not comfortable prognosticating the likelihood of recovery.[13] On cross, he agreed that Riccobono had been drawing unemployment

[11]Id. at 1078-79.

[12]*Id.* at 1089.

[13]*Id.* at 1099.

compensation since July 1994, and that she would have to have verified her ability to work in order to do that.[14]

Dr. Phillip Frank, another clinical psychologist called by Riccobono, also took the stand twice, once before and once after the County's objection to Deaton. The first time, he said he had treated Riccobono in 1983 and 1984, then again from 1990 to 1994. He saw her on October 25, 1993, at which time, according to his notes, he thought her "[p]rognosis good, if she does not return to abusive work environment."[15] In 1994, he felt that posttraumatic stress disorder was a "[p]ossible diagnosis."[16] The second time, he said in essence that Riccobono had been unable to work from October 1993 to July 1994. He did not say that she had been unable to work after July 1994; indeed, he acknowledged that on July 14, 1994, he had certified to the Employment Security Department that she was able to work.

Dr. Christopher Miller, a family practitioner called by Riccobono, testified that he treated her from August 1984 through June 1987, then again in April 1991 through 1995. On July 18, 1994, he thought that Riccobono could work full time without restrictions other than heavy lifting.[17] When asked for a current prognosis, he responded, "if she does well, she should lead a normal life, but she may have to be on medication."[18]

Dr. Jay Hugh Ehly, a psychiatrist called by the County, diagnosed Riccobono as having dysthymia, or long-term depression. He also stated, "I saw no evidence of dysfunction that I believe would render her unemployable or that her employability or her ability to function in an oc-

---

[14]*Id.* at 1090-91.

[15]*Id.* at 414.

[16]*Id.* at 426.

[17]*Id.* at 364.

[18]*Id.* at 333.

cupational setting is different than it has been in the past.''[19]

Riccobono herself testified that she received unemployment benefits (which required contacting three prospective employers per week) for three or four months, beginning in July 1994.[20] She said she had wanted to work but was apprehensive.[21] She did not testify that she could not work, although she did testify to many mental and physical problems. Tony Riccobono, her ex-husband, testified to how much she had changed, but he did not say she was unable to work.

At the end of the evidence, the County moved to dismiss the § 1983 claims as a matter of law, and the trial court granted the motion. The court submitted the remaining claims, and the jury found the County liable. Using a special verdict form, the jury awarded past economic damages of $18,000 and future economic damages of $365,000.[22]

After trial, Riccobono sought reasonable attorney fees of approximately $141,000. The court awarded $45,000, plus costs of about $13,580. Later, the court entered judgment for a total of $441,580.

The County now appeals, and Riccobono cross-appeals. The primary issues are (1) whether Riccobono was entitled to sue in superior court without exhausting her civil service and collective bargaining remedies, and (2) whether the trial court erred by admitting Deaton's testimony. There are a number of lesser issues also, which we discuss in the unpublished portion of this opinion.

I.

The County argues that Riccobono could not bring an ac-

---

[19]*Id.* at 941.

[20]*Id.* at 1475.

[21]*Id.* at 1475-76.

[22]The jury also awarded noneconomic damages of $358,000. The trial court granted the County's posttrial motion to set aside that award, and that ruling is not contested on appeal.

tion in the superior court (A) because "[t]he constructive discharge doctrine does not apply to employees with civil service protections," and (B) because "the doctrine is generally, if not exclusively, applied to employment at will situations."[23]

## A.

■ A discharge may be express or constructive. Either way, it will support a cause of action only if it was *wrongful*. It will not support a cause of action if it was rightful. Consequently, the law does not recognize an action for *constructive* discharge; instead, it recognizes an action for *wrongful* discharge, which may be either express or constructive.

■ A discharge may be wrongful for a number of reasons. It may be a breach of the underlying employment contract (or, in the case of public employment, of the underlying statutorily-controlled employment relationship);[24] it may be a violation of statute; it may be a tort; or it may, conceivably, offend the law in some other way.

If a discharge is wrongful because it constitutes a breach, the claimant generally must utilize the procedures and remedies incorporated within the contract (or, in the case of public employment, within the statutorily-controlled employment relationship), if such procedures and remedies were intended to be exclusive. Civil service employment is controlled by the civil service statutes as now existing or hereafter amended, subject to Washington Constitution article 1, section 23.[25] The Legislature intended that those

---

[23]Br. of Appellants at 11-12.

[24]*See Washington Fed'n of State Employees v. State*, 101 Wn.2d 536, 542, 682 P.2d 869 (1984); *Association of Capitol Powerhouse Eng'rs v. State*, 89 Wn.2d 177, 184, 570 P.2d 1042, 95 A.L.R.3D 1090 (1977); *Weber v. State*, 78 Wn. App. 607, 610, 898 P.2d 345 (1995).

[25]*State Employees*, 101 Wn.2d at 542; *Powerhouse Eng'rs*, 89 Wn.2d at 184; *Weber*, 78 Wn. App. at 610. A legally equivalent way of expressing the same idea would be to say that the civil service employment is grounded on a contract of employment formed between the public employer and the employee, but that the

statutes and regulations be the exclusive remedy for breach.[26] Accordingly, a claimant suing for breach of an employment relationship controlled by the civil service statutes and regulations must exhaust the procedures and remedies set forth therein.

■■ If a discharge is wrongful because it violates RCW 49.60, pertaining to discrimination and retaliation, the claimant has whatever remedies the Legislature intended to authorize.[27] As amended in 1957, RCW 49.60 provides that nothing in that chapter should "deny the right to any person to institute any action or pursue any civil or criminal remedy based upon an alleged violation of his civil rights."[28] Accordingly, a civil service or union employee may sue for a violation of RCW 49.60 without exhausting civil service or union remedies.[29]

Riccobono alleges that she was discharged in violation of RCW 49.60.210. She does not allege that she was discharged in violation of the civil service statutes or her union's col-

contract incorporates, as implied and controlling terms, the civil service statutes as now existing or hereafter amended, subject to Washington Constitution article 1, section 23. Analogous language is often used in connection with corporate articles of incorporation; they are said to impliedly "incorporate" the laws of the state, which means only that corporate articles are a contract controlled by, and subject to, the laws of the state. *Howe v. Washington Land Yacht Harbor, Inc.*, 77 Wn.2d 73, 84, 459 P.2d 798 (1969) ("It is elementary . . . that the laws of this state . . . enter into and become a part of the articles of incorporation."); *State ex rel. Starkey v. Alaska Airlines, Inc.*, 68 Wn.2d 318, 328, 413 P.2d 352 (1966) ("The provisions of the statute under which a corporate charter is granted is an integral part of the charter and binds all parties to the contract, the state, the corporation, and the shareholders."); *McMurray v. Security Bank*, 64 Wn.2d 708, 711, 393 P.2d 960 (1964); *Bellinger v. West Coast Tel. Co.*, 54 Wn.2d 576, 578, 343 P.2d 189 (1959).

[26]*Reninger v. State*, 79 Wn. App. 623, 632, 901 P.2d 325 (1995) ("the Legislature intended that a civil service employee utilize [civil service remedies] before gaining access to the superior court for additional remedies"), *aff'd on other grounds*, 134 Wn.2d 437 (1998); *Weber*, 78 Wn. App. at 611.

[27]RCW 49.60.030(2); *see Dailey v. North Coast Life Ins. Co.*, 129 Wn.2d 572, 575-76, 919 P.2d 589 (1996); *Xieng v. Peoples Nat'l Bank*, 120 Wn.2d 512, 530, 844 P.2d 389 (1993).

[28]RCW 49.60.020; *see also Milligan v. State*, 90 Wn. App. 586, 597, 953 P.2d 112, 117 (1998); *Wilson v. Monroe*, 88 Wn. App. 113, 125, 943 P.2d 1134 (1997), *review denied*, 134 Wn.2d 1028, 958 P.2d 318 (1998).

[29]*Milligan*, 90 Wn. App. at 597 (civil service); *Wilson*, 88 Wn. App. at 125 (union).

lective bargaining agreement. We conclude that she is entitled to bring this suit, whether or not she exhausted her civil service and collective bargaining remedies.

## B.

Relying on suggestions made in *Micone v. Town of Steilacoom Civil Serv. Comm'n*,[30] and *Albright v. Department of Soc. & Health Servs.*,[31] the County contends that an employee cannot sue for a wrongful discharge that was "constructive" as opposed to express, unless the employee's employment was terminable at will. Necessarily, then, it is distinguishing between (1) the discharge that is constructive and the discharge that is express, and (2) employment terminable at will and employment terminable only for cause.

The first distinction makes no difference in an action for wrongful discharge. If a discharge occurred, and if it was wrongful for one or more reasons, it is equally actionable whether express or constructive.

The second distinction makes a difference when a wrongful discharge action is based on an alleged breach of the employment contract; such an action lies when employment is terminable for cause, but not when employment is terminable at will.[32] The second distinction makes no difference, however, when a wrongful discharge action is based on RCW 49.60, the antidiscrimination and antiretaliation statutes. The Legislature intended to impose on all employers of eight or more people a duty not to discriminate unlawfully, as well as a duty not to retaliate unlawfully

---

[30]44 Wn. App. 636, 643 n.2, 722 P.2d 1369, *review denied*, 107 Wn.2d 1010 (1986).

[31]65 Wn. App. 763, 768, 829 P.2d 1114 (1992).

[32]*Hill v. J.C. Penney, Inc.*, 70 Wn. App. 225, 233, 852 P.2d 1111, *review denied*, 122 Wn.2d 1023 (1993); *McGuire v. State*, 58 Wn. App. 195, 197, 791 P.2d 929, *review denied*, 115 Wn.2d 1021 (1990), *cert. denied*, 499 U.S. 906 (1991).

against certain protected conduct.[33] The County's contention runs counter to that intent, for it would permit racial and other forms of unlawful discrimination, as well as unlawful retaliation, against employees terminable only for cause. Accordingly, we hold a claimant's right to sue under RCW 49.60, if any, is not affected by whether his or her employment was terminable at will or only for cause. We disapprove the contrary suggestion in footnote 2 of *Micone*,[34] and we decline to follow the contrary suggestion in *Albright*.[35]

## II.

As noted above, the trial court allowed Deaton to opine, over the County's timely and specific objection, that Riccobono would suffer $299,399 in future economic loss.[36] On appeal, the County reiterates its claim that Deaton's opinion was inadmissible because he was relying on assumptions for which he had no factual basis, in the record or otherwise. In responding, Riccobono does not cite to parts of the record that would support Deaton's assumptions; instead, she merely asserts that "[i]nherent in every expert's testimony . . . is some degree of non-clairvoyant speculation;" that "the lack of absolute certainty does not prohibit the introduction of such evidence;" and that "[i]t was for the jury to decide whether Mr. Deaton's conclusions were reasonable."[37]

Washington adopted its evidence rules in 1979. Before that, its evidence law required (1) that an expert had to

---

[33]*See* RCW 49.60.180(2); RCW 49.60.210; RCW 49.60.040(3).

[34]44 Wn. App. at 643.

[35]65 Wn. App. at 768.

[36]For reasons we cannot discern from the record, the jury actually awarded future economic loss of $365,000. The County claims that the jury exceeded the range of the evidence, but we do not reach that claim. Except as discussed in section I, the County does not attack the jury's award of past economic damages, and nothing said herein disturbs that award.

[37]Br. of Resp't at 16-17.

have a factual basis for his or her opinion; (2) that the factual basis appear in the record;[38] and (3) that the expert disclose the factual basis before stating his or her opinion. This meant that the factual basis had to be composed of information that was both admissible and admitted.

▮ Washington altered the second of these three requirements by adopting ER 703. Entitled "Bases of Opinion Testimony by Experts," that rule provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This rule indicates that an expert's factual basis may be composed of (a) information in the record or (b) information not in the record but reasonably relied on by others in the field. It does *not* indicate that an expert need not *have* a factual basis. On the contrary, the federal Advisory Committee commented on the identical federal rule, Fed. R. Evid. 703, as follows:

> Facts or data upon which expert opinions are based may, under this rule, be derived from three possible sources. The first is the firsthand observation of the witness, with opinions based thereon traditionally allowed. A treating physician affords an example. [Citation omitted.] Whether he must first relate his observations is treated in Rule 705. The second source, presentation at the trial, also reflects existing practice. The technique may be the familiar hypothetical question or having the expert attend the trial and hear the testimony establishing the facts. Problems of determining what testimony the expert relied upon, when the latter technique is employed and the testimony is in conflict, may be resolved by resort to Rule 705. The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed

---

[38]This meant, of course, that the factual basis had to be composed of information that was (a) admissible and (b) actually admitted.

to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court.[39]

Washington also altered the third requirement, disclosure, by adopting ER 705. Entitled "Disclosure of Facts or Data Underlying Expert Opinion," that rule provides:

> The expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the judge requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross examination.

This rule indicates that an expert need not *disclose* his or her factual basis unless otherwise ordered by the court.[40] Like ER 703, however, it does *not* indicate that an expert need not *have* a factual basis.

Here, no one testified that Riccobono was unable to work, after July 1994, due to physical or mental disability. No one testified that Riccobono was unable to work, after July 1994, in the competitive labor market. No one testified that Riccobono would actually earn $7 an hour when she returned to work, or that she would actually earn less than $10 per hour for the remainder of her work life. Deaton *assumed* these facts, while candidly admitting that he had not determined their actual existence. His opinion was based on assumptions for which there was no factual basis, and the award for future economic loss must be reversed.

We affirm the imposition of liability and the award of past economic damages. We reverse the award of future economic damages. We remand the case to the trial court for further proceedings consistent herewith.

---

[39]56 F.R.D. 283 (Fed. R. Evid. 703 advisory committee's note).

[40]The question of whether an expert is *required* to disclose his or her factual basis differs, of course, from the question of whether an expert is *permitted* to disclose his or her factual basis. For authorities on the latter question, *see* ER 403; *Group Health Coop. v. Department of Revenue*, 106 Wn.2d 391, 399-400, 722 P.2d 787 (1986); *State v. Martinez*, 78 Wn. App. 870, 879-80, 899 P.2d 1302 (1995), *review denied*, 128 Wn.2d 1017 (1996); JACK B. WEINSTEIN, WEINSTEIN'S EVIDENCE 705-10 (1991).

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

HOUGHTON, C.J., and ARMSTRONG, J., concur.

Reconsideration denied October 30, 1998.