181 P.3d 864 (2008)
Candace WAHL, Respondent,
v.
DASH POINT FAMILY DENTAL CLINIC, INC., a Washington corporation, and Don S. Moore, Appellants.
No. 35201-0-II.
Court of Appeals of Washington, Division 2.
April 15, 2008.
*866 Peter Thomas Petrich, Carol J. Cooper, Davies Pearson PC, Tacoma, for Appellants.
Pierre E. Acebedo, Acebedo & Johnson, LLC, Puyallup, John William Ladenburg Jr., Ladenburg Law PLLC, Eric Francis Ladenburg, Ladenburg Law PLLC, Tacoma, for Respondent.
QUINN-BRINTNALL, J.
¶ 1 Dr. Don S. Moore, co-owner of Dash Point Family Dental Clinic, Inc., appeals the trial court's finding that he violated Washington's public policy against gender discrimination and wrongfully discharged Candace Wahl. Because Wahl proved a valid common law claim for discrimination based on gender, which includes creating the hostile work environment established here, we affirm.

FACTS
¶ 2 In August 2003, Wahl was nearing the completion of Bryman College's dental assistant program. To obtain the program's certificate, the college required Wahl to complete an unpaid externship at a dental clinic. The school placed Wahl with the Dash Point Family Dental Clinic located in Federal Way, Washington, to perform her externship. Dr. Moore, a Pierce County resident, co-owned and operated the clinic.
¶ 3 During her externship, Wahl received two written evaluations, both favorable. In addition, the clinic's office manager, Janice Pernell, complimented Wahl's work and told Wahl that Dr. Moore liked having her as his assistant. Following her externship, the clinic hired Wahl as a full-time paid dental assistant.
¶ 4 A few months after Wahl began working as a paid employee, Dr. Moore started making inappropriate and sexually explicit comments to her. The comments included Dr. Moore's wife's preferences during sex, references to oral sex, graphic details about Dr. Moore's sex life, the size of his penis, and comments about the bodies of female patients and employees. Some of these comments were about Wahl's breasts and about Dr. Moore's physical attraction to Wahl's mother, who was a patient at the clinic.
¶ 5 During the last three months of Wahl's employment, Dr. Moore's comments became increasingly graphic and more frequent. Pernell testified that she heard Dr. Moore make sexually explicit comments at the clinic. Pernell also testified that Dr. Moore demanded that she have oral sex with him and that he asked her to buy condoms so they could have sexual intercourse in the clinic's *867 conference room. Pernell further testified that she tried to warn all the new externs about Dr. Moore and told them that he was a "pervert." 2 Report of Proceedings (RP) at 187.
¶ 6 At first, Wahl ignored Dr. Moore's comments and continued working. But on Monday, February 23, 2004, when Dr. Moore told Wahl that he wanted her to watch him masturbate, she could no longer ignore him. Later that day, Dr. Moore asked Wahl to go to the darkroom with him so he could teach her how to duplicate a patient's film. The clinic's darkroom was the size of a small walk-in closet. As Wahl was preparing the film, Dr. Moore told her to quit what she was doing and turn around so he could "finish faster." 1 RP at 59. Wahl refused to turn around, but she testified that she could smell lotion and could hear Dr. Moore masturbating behind her. Wahl told Dr. Moore that what he was doing was wrong and the incident ended abruptly when Dr. Moore's wife, a hygienist at the clinic, knocked on the darkroom's door.
¶ 7 Wahl testified that she did not know what to do; she felt violated, uncomfortable, and disgusted, but continued to work for the rest of the week. During that week, Wahl noticed that Dr. Moore became more critical of her work. Four days later, Wahl told her mother about the darkroom incident. The following Monday, Wahl left her job at the clinic. Dr. Moore then directed Pernell to write a letter denying that any sexual misconduct had occurred between Pernell and Dr. Moore.
¶ 8 Wahl and her mother reported the darkroom incident to the police. Wahl's mother testified that the police officer told them that there was nothing he could do because Wahl did not actually see Dr. Moore masturbating. Wahl also reported the incident to Bryman College. The college investigated and found that no misconduct had occurred, but the trial court found that the college's investigation of the incident was not credible. When Wahl applied for unemployment compensation, the clinic reported that, because Wahl had quit her job, it owed no unemployment compensation. Ultimately, Wahl found another job and did not collect unemployment.
¶ 9 After Wahl quit, Dr. Moore also directed Pernell to write several letters of reprimand, back-date them, and place them in Wahl's personnel file. Wahl testified that she had never received any written evaluations or written reprimands during her time as a paid employee. Dr. Moore admitted back-dating the letters, but he claimed that the dates accurately reflected the dates of Wahl's violations of clinic rules and policies. The trial court found that Dr. Moore's testimony explaining why he directed Pernell to back-date the reprimands was not credible and that the majority of the letters were fabricated.
¶ 10 Following a bench trial, the trial court found that Wahl had been wrongfully discharged in violation of Washington's public policy against gender discrimination and awarded her $20,000 in damages. Dr. Moore appeals.

ANALYSIS
Conclusions of Law
¶ 11 Dr. Moore challenges five of the trial court's conclusions of law,[1] arguing that *868 Wahl's cause of action is not "legally cognizable" in Washington because there is no common law claim for sexual harassment or hostile work environment. Br. of Appellant at 22. We review conclusions of law de novo. Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 880, 73 P.3d 369 (2003).
¶ 12 Washington's Law Against Discrimination (WLAD) establishes Washington's prohibition of gender discrimination in the workplace. Former RCW 49.60.030(1) (1997). But former RCW 49.60.040(3) (1997) limits claims under WLAD to employers with more than eight employees. An employee may, however, bring a common law gender discrimination claim against an employer even though the employer has fewer than eight employees. In Roberts v. Dudley, 140 Wash.2d 58, 993 P.2d 901 (2000), our Supreme Court held that plaintiff's action for wrongful discharge in violation of the public policy against gender discrimination is cognizable at common law. See also Bennett v. Hardy, 113 Wash.2d 912, 784 P.2d 1258 (1990) (court found an implied cause of action for wrongful discharge even though the issue was not raised below).
Wrongful Termination in Violation of Public Policy
¶ 13 The tort of wrongful discharge in violation of public policy required that Wahl prove four elements: (1) the existence of a clear public policy (the clarity element), (2) that discouraging the conduct in which she engaged would jeopardize the public policy (the jeopardy element),[2] (3) the public policy linked conduct caused Wahl's dismissal (the causation element), and (4) that Dr. Moore did not establish an overriding justification for Wahl's dismissal (the absence of justification element). Gardner v. Loomis Armored, Inc., 128 Wash.2d 931, 941, 913 P.2d 377 (1996) (adopting the analysis set out by Henry H. Perritt, Jr., Workplace Torts: Rights and Liabilities § 3.7 (1991)).
A. The Clarity Element
¶ 14 To determine whether Dr. Moore violated a clear mandate of public policy, we "inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy." Roberts, 140 Wash.2d at 63, 993 P.2d 901 (citing Thompson v. St. Regis Paper Co., 102 Wash.2d 219, 232, 685 P.2d 1081 (1984)).
¶ 15 In Roberts, our Supreme Court held that there is a clear mandate in Washington of public policy against sex discrimination. 140 Wash.2d at 77, 993 P.2d 901. This policy "is at the core of RCW 49.60. . . . This statute provides an abundantly clear statement of public policy upon which a common law cause of action for wrongful discharge may be predicated." Roberts, 140 Wash.2d at 77, 993 P.2d 901. Therefore, while Wahl cannot bring a statutory claim under chapter 49.60 RCW because the clinic has fewer than eight employees, the clear mandate of public policy against sex discrimination set out in that statute remains and supports the policy element of the common law tort of wrongful discharge in violation of public policy.
B. The Jeopardy Element
¶ 16 The next issue is whether Wahl's discharge contravenes or jeopardizes the public policy of eliminating and preventing gender discrimination in employment. Gardner, 128 Wash.2d at 941, 913 P.2d 377. To establish jeopardy, "plaintiffs must show they engaged in particular conduct, and the conduct directly relates to the public policy, or was necessary for the effective enforcement of the public policy." Gardner, 128 Wash.2d at 945, 913 P.2d 377. In addition, the plaintiff "must show how the threat of dismissal will discourage others from engaging in the desirable conduct." Gardner, 128 Wash.2d at 945, 913 P.2d 377.
¶ 17 A hostile work environment leading to a constructive discharge is a subset of *869 gender discrimination. Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998); Roberts, 140 Wash.2d at 76 n. 14, 993 P.2d 901. Here, the trial court's unchallenged findings establish that Dr. Moore made sexually graphic comments to Wahl for several months; the comments became more graphic, culminating with Dr. Moore masturbating in Wahl's presence, and that Wahl rebuffed Dr. Moore's sexual advances but feared losing her job. Pernell testified that she did not rebuff Dr. Moore's sexual advances for fear of losing her job. Public policy favors rebuffing unwanted sexual advances in the workplace where engaging in sexual activity negatively impacts productivity, employment stability, and client care. Public policy supports Wahl's desire to conduct her work duties without engaging in unwanted sexual activity.
C. The Causation Element
¶ 18 We next examine whether gender discrimination in the form of creation of a hostile work environment caused Wahl's wrongful discharge. Gardner, 128 Wash.2d at 941, 913 P.2d 377. In this case, Dr. Moore did not terminate Wahl; she quit her job one week after the darkroom masturbation incident.
¶ 19 A cause of action for wrongful discharge in violation of public policy may be based on "either express or constructive" discharge. Snyder v. Med. Serv. Corp. of E. Wash., 145 Wash.2d 233, 238, 35 P.3d 1158 (2001) (citing Riccobono v. Pierce County, 92 Wash.App. 254, 263, 966 P.2d 327 (1998)); see also Korslund v. DynCorp Tri-Cities Servs., Inc., 156 Wash.2d 168, 177 n. 1, 125 P.3d 119 (2005) ("we find no compelling reason why the tort cannot be based on constructive discharge").
¶ 20 To establish constructive discharge, the employer must engage in a deliberate act that made working conditions so intolerable that a reasonable person would have felt compelled to resign. Sneed v. Barna, 80 Wash.App. 843, 849, 912 P.2d 1035, review denied, 129 Wash.2d 1023, 919 P.2d 600 (1996). It is the act, not the result, which must be deliberate. Barrett v. Weyerhaeuser Co. Severance Pay Plan, 40 Wash. App. 630, 637, 700 P.2d 338 (1985). Whether conditions are intolerable is a question of fact. Bulaich v. AT & T Info. Sys., 113 Wash.2d 254, 261-62, 778 P.2d 1031 (1989). The "intolerable" element can be shown by aggravated circumstances or a pattern of conduct. Sneed, 80 Wash.App. at 850, 912 P.2d 1035 (citing Wunderly v. S.C. Johnson & Son, Inc., 828 F.Supp. 801, 806 (D.Or. 1993)). Additionally, the employee must show that she resigned because of the conditions and not for some other reason, like finding a better job. Glasgow v. Georgia-Pacific Corp., 103 Wash.2d 401, 408, 693 P.2d 708 (1985) (citing Henson v. City of Dundee, 682 F.2d 897, 907 (11th Cir.1982)).
¶ 21 Here, the trial court found that a reasonable person would find Dr. Moore's continuous pattern of making sexually graphic comments was an intolerable working condition. These comments were made a few times a week for at least three months and escalated until, over Wahl's objections, Dr. Moore masturbated in the darkroom while he was supposed to be training her on how to duplicate x-ray film.
¶ 22 The trial court found that Wahl's testimony about the sexual episodes was credible. We defer to the trial court evidence regarding witness credibility and conflicting testimony. Weyerhaeuser v. Tacoma-Pierce County Health Dep't, 123 Wash.App. 59, 65, 96 P.3d 460 (2004). Under the facts presented here, a rational trier of fact could conclude that Dr. Moore's deliberate sexual harassment behavior created working conditions so intolerable that Wahl reasonably felt compelled to resign. Thus, Wahl was constructively discharged.
D. The Absence of Justification Element
¶ 23 The final element is whether Dr. Moore had an overriding justification for discharging Wahl. Gardner, 128 Wash.2d at 947, 913 P.2d 377.
¶ 24 Here, Dr. Moore testified that Wahl's performance as an extern was "substandard" and that he had given Wahl several verbal reprimands concerning her poor performance. He also testified that when he discovered that her file was empty, he instructed *870 Pernell to write letters documenting the verbal reprimands and to back-date the letters accordingly. But the trial court found that the letters of reprimand were written after Wahl filed a claim for unemployment compensation with the Employment Security Department, and that the majority of the letters were falsified. Dr. Moore does not challenge these findings and has not offered any other justifications warranting Wahl's dismissal.
¶ 25 Viewing the evidence in the light most favorable to Wahl, as we must, there was sufficient evidence to support all four elements of the common law tort of wrongful discharge. The unchallenged findings support the trial court's conclusion that Dr. Moore had violated Washington's public policy against gender discrimination when he sexually harassed Wahl, that this behavior led to Wahl's constructive discharge, and, thus, Wahl was wrongfully discharged in violation of public policy. Roberts, 140 Wash.2d at 60, 993 P.2d 901; Gardner, 128 Wash.2d at 947, 913 P.2d 377.
Finding of Fact Number 17
¶ 26 Dr. Moore argues that the trial court erred when it found that, following the darkroom incident, Wahl did not work the rest of the day. Dr. Moore did not challenge the remaining 40 findings, which are verities on appeal. Erwin v. Cotter Health Ctrs., 161 Wash.2d 676, 687, 167 P.3d 1112 (2007) (citing In re Estate of Jones, 152 Wash.2d 1, 8, 93 P.3d 147 (2004)).
¶ 27 Dr. Moore insists that this finding prejudiced him because it was necessary to support the trial court's conclusion that "the disputed darkroom incident did occur" and that "Wahl was so upset by the incident that she suffered emotional distress damages." Br. of Appellant at 24-25. We disagree.
¶ 28 At trial, Wahl testified that, after the darkroom incident, she tried to avoid Dr. Moore, that she worked the rest of the week, and that she quit the following Monday. While the record does not support the trial court's finding that Wahl did not work the rest of the day, this finding did not prejudice Dr. Moore. In separate unchallenged findings, the trial court found that the darkroom masturbation incident had occurred, that Wahl worked the rest of that day and week, and that Wahl's emotional distress was related to Dr. Moore's sexual harassment, including, but not limited to, the darkroom incident. Dr. Moore did not challenge these other findings, which are supported by the record. The error in finding of fact number 17 was harmless.
Damages
¶ 29 Dr. Moore asserts that the trial court erred when it awarded Wahl emotional distress damages because Wahl failed to prove wrongful termination in violation of public policy. But Dr. Moore acknowledges that if Wahl had established the tort, emotional distress damages may be recoverable.
¶ 30 "[D]amages for emotional distress are recoverable as an element of damages merely upon proof of `an intentional tort.'" Cagle v. Burns & Roe, Inc., 106 Wash.2d 911, 919-20, 726 P.2d 434 (1986) (citing Cherberg v. Peoples Nat'l Bank of Wash., 88 Wash.2d 595, 564 P.2d 1137 (1977)). Thus, "upon proof of the tort of wrongful termination of employment in violation of public policy, the claimant only is required to offer proof of emotional distress in order to recover those damages attributable to the wrongful termination."[3]Cagle, 106 Wash.2d at 920, 726 P.2d 434.
¶ 31 At trial, Wahl offered proof of emotional distress when she testified that, following the darkroom incident, she felt disgusted, used, and violated; that she could no longer work for another dentist again; that she has become claustrophobic; that she can only work in warehouse-type open spaces; and that, when she sees a car similar to Dr. Moore's, her stomach "clenches." 1 RP at 68. Wahl also testified that she sought counseling but did not feel the process was helpful. In addition, Wahl's mother testified that Wahl's mood changed halfway through her employment with Dr. Moore and that Wahl *871 became withdrawn and began to spend more time in her bedroom. As discussed above, there was sufficient evidence to find that Dr. Moore had wrongfully discharged Wahl in violation of public policy and, thus, damages for the resulting emotional distress proved were recoverable.
¶ 32 Affirmed.
I concur: ARMSTRONG, P.J., and HUNT, J.
NOTES
[1] Dr. Moore challenged the following conclusions of law:

5. It is a violation of the common law of the State of Washington to sexually harass an employee. There was sufficient evidence to prove a common law claim of sexual harassment against Dr. Moore.
6. Furthermore, there was a hostile working environment created by Dr. Moore. When the person you are to report a sexual harassment claim to is the harasser and there is no higher person, there is no requirement to complain. Were Candace Wahl to have complained to either Dr. Moore or Mrs. Moore, it would not have any benefit and thus would have been an exercise in futility.
. . . .
8. Candace Wahl was constructively discharged as the working conditions and environment were so intolerable that a reasonable person would have quit. Further Candace Wahl quit in response to Dr. Moore's sexually harassing conduct.
. . . .
13. There was sufficient evidence to prove emotional distress damages.
14. The court concludes that a reasonable award to Plaintiff, Candace Wahl is $20,000.
Clerk's Papers at 37.
[2] As discussed later, in this context, Wahl's conduct was her attempt to perform her work duties despite Dr. Moore's attempts to engage her in unwanted sexual activity.
[3] Wahl was not required to "prove that emotional distress was intended or reasonably foreseeable by the defendant in order to recover damages for emotional distress where there is an independent basis for liability." Cagle, 106 Wash.2d at 920, 726 P.2d 434.