**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UTE INDIAN TRIBE OF THE UINTAH
AND OURAY RESERVATION,

Plaintiff - Appellant,

v.

UTE DISTRIBUTION CORPORATION;
LOIS LAROSE; CHARLES DENVER;
LYNN MCLURE; PALA NELSON;
REBECCA CURRY,

Defendants - Appellees.

No. 10-4213
(D.C. No. 2:06-CV-00557-CW)
(D. Utah)

**ORDER AND JUDGMENT**\*

Before **KELLY, O'BRIEN,** and **MATHESON,** Circuit Judges.

**MATHESON**, Circuit Judge.

In this case the Ute Indian Tribe challenges three amendments ("the

Amendments") to the Articles of Incorporation of the Ute Distribution Corporation

---

\*This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

("UDC"). The UDC represents former members of the Tribe known as "mixed-bloods" and jointly manages assets with the Tribe's "full-blood" leadership.[1] Perceiving a takeover threat from the Tribe, the UDC board of directors proposed and the UDC shareholders adopted the Amendments, one of which prohibits persons affiliated with the Tribe from serving on the board of directors. The Tribe sued the UDC, arguing that the Amendments violated Utah corporate law. The district court granted summary judgment for the UDC. We affirm.

## I. BACKGROUND

### A. *The Relationship between the Tribe and the UDC*

In 1954, Congress passed the Ute Termination Act, 25 U.S.C. § 677 et seq., which the parties refer to as the Partition Act. The Partition Act divided the assets of the Ute Tribe between the "full-blood" members of the Tribe and the former members known as "mixed-bloods." *See* 25 U.S.C. § 677i. Some of the assets, such as oil, gas, mineral, hunting, and fishing rights, were not susceptible to distribution. Under the Partition Act, these assets are jointly managed by the Tribe and a representative of the mixed-bloods.

The Partition Act provides: "The mixed-blood members of the [T]ribe . . . shall have the right to organize for their common welfare, and may adopt an appropriate constitution and bylaws. . . ." 25 U.S.C. § 677e. It continues: "Such constitution may

---

[1] As we said in a previous case, "The legislation at issue, the parties, and the court below used the terms 'mixed blood' and 'full blood.' We repeat those terms solely for consistency." *Ute Distrib. Corp. v. Sec. of Interior*, 584 F.3d 1275, 1276 n.1 (10th Cir. 2009).

2

provide for the selection of authorized representatives who shall have power to take any action that is required by this subchapter to be taken by the mixed-blood members as a group. . . ." *Id.*

In 1958, the mixed-bloods organized the Ute Distribution Corporation, a nonprofit Utah corporation, as their representative.[2] When it was created, the UDC was divided into 4,900 shares, 10 of which were given to each of the 490 original mixed-bloods. Initially, the shares could not be transferred unless first offered to a full-blood, but now the shares may be freely transferred. The Ute Tribe currently holds approximately 20% of the UDC's shares. The Tribe and the UDC dispute whether any individual full-blood tribal member—as opposed to the Tribe itself—holds UDC shares. Tribal member Kirby Arrive claims he holds UDC shares, but the UDC claims he holds them "in name only." Joint App. Vol. I at 163.

The Tribe and the UDC also contest the history of their relationship. The UDC characterizes this history as one of continued conflict over the jointly managed assets and accuses the Tribe of repeatedly attempting to diminish the power and property of the mixed-bloods. The Tribe says that the joint management of the assets has been largely harmonious, but concedes that "[i]n recent years . . . preceding the adoption of the

---

[2] The Supreme Court has stated: "Clearly, it is [the] UDC . . . that is entitled to manage the oil, gas, and mineral rights with the committee of the full-bloods." *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 144 (1972).

3

amendments, there had been several points of friction between the Tribe and the UDC."

Aplt. Br. at 10.

**B.** *The Amendments*

In 2006, the UDC board of directors proposed three amendments to the UDC's

Articles of Incorporation. It also oversaw a shareholder vote adopting them after this

litigation commenced. We will refer to the Amendments as the Qualification

Amendment, the Power Amendment, and the Cause Amendment.[3]

The Qualification Amendment modified the qualifications required for service on

the UDC board of directors. Before the Qualification Amendment, the Articles required

that directors be United States citizens, over the age of 21, and UDC shareholders. The

Qualification Amendment added the following:

> Because the primary purpose of this corporation is to jointly manage certain assets
> with the Tribal Business Committee of the Ute Indian Tribe of the Uintah and Ouray
> Reservation, it is critical for all members of the Board of Directors to remain
> independent from the Ute Indian Tribe and free to vote on all matters in the best
> interest of this corporation and its shareholders. As a result, (i) no enrolled member
> of the Ute Indian Tribe, (ii) no person employed in a full-time or part-time capacity,
> with or without compensation, by the Ute Indian Tribe, and (iii) no person serving in
> a consulting or advisory capacity, whether directly or indirectly, paid or unpaid, on a
> full or part-time basis to the Ute Indian Tribe shall be nominated, voted upon, or
> eligible to serve as a member of the Board of Directors.

---

[3] The parties and the district court refer to the Amendments by number, but use
different numbering schemes. We use this shorthand to avoid confusion.

4

Joint App. Vol. I at 88.[4]  The Qualification Amendment also specified that any current

UDC director who assumed one of the prohibited relationships with the Tribe would be

removed from his or her position.

The Power Amendment specifies who may exercise the UDC's corporate powers.

Before the Power Amendment, the relevant provision in the Articles stated:  "[T]he

Board of Directors shall exercise the corporate powers of the corporation."  *Id.* at 75.

The Power Amendment modified that provision.  It now states:  "The exercise of

corporate powers of this corporation shall be vested exclusively in its duly elected Board

of Directors.  The stockholders shall not exercise any corporate power unless requested to

do so in a written resolution adopted by the Board of Directors and submitted to the

stockholders for approval."  *Id.* at 89-90.

The Cause Amendment states that shareholders may only remove a director upon a

showing of cause.  It defines "cause" to include missing three or more board meetings in

a year, being convicted of a felony, or being declared incompetent by a court.  A director

may also be removed for cause if, 30 days after receiving written notification, the director

"continue[s] to fail to meet any condition of eligibility for service as a member of the

Board of Directors as such qualifications are described in the Articles or Bylaws."  *Id.* at

89.

_____

[4] We use the phrase "Tribe affiliate" to refer to a person who is a full-blood
member of the Tribe or has any other relationship with the Tribe that makes the person
ineligible to serve as a UDC director because of the Qualification Amendment.

**C.** *Procedural History*

On July 7, 2006, the Ute Tribe sued the UDC and its board of directors in the Eighth Judicial District Court for the State of Utah. The Tribe sought to enjoin the vote on the proposed Amendments, claiming that it could not lobby against the Amendments because it did not receive proper notice and a list of shareholders to contact. The Tribe also claimed that the Amendments violated Utah corporate law. The complaint further alleged that the Amendments racially discriminated against the Tribe in violation of the Civil Rights Act, 42 U.S.C. § 1981.

The UDC removed the suit to federal court.[5] The UDC's notice of removal offered three grounds for federal jurisdiction. First, the Tribe's complaint had alleged a violation of the Partition Act. Second, the Tribe had alleged a violation of the Civil Rights Act. Third, because Congress had appointed the UDC as a representative of the mixed-bloods, the case could also have been removed under 28 U.S.C. § 1442.

On July 14, 2006, the federal district court granted a preliminary injunction and ordered that the vote on the Amendments not occur until after August, 25, 2006, to allow the Tribe the opportunity to persuade shareholders to vote against the Amendments, thereby resolving the notice claim. The shareholders voted on the Amendments on October 7, 2006. Each of the Amendments passed, with approximately 69% of the

---

[5] The UDC offered 28 U.S.C. § 1441 and § 1442 as statutory bases for removal. We explain below that the only proper basis for subject matter jurisdiction was federal question jurisdiction based on the Civil Rights Act claim. Therefore, the suit was properly removed pursuant to 28 U.S.C. § 1441(b).

shareholders voting in favor of them.

The Tribe voluntarily moved to withdraw its Civil Rights Act claim, and on December 12, 2007, the court granted the withdrawal.

On November 21, 2008, the Tribe moved for summary judgment on its remaining claims, which all sounded in Utah corporate law. The Tribe claimed that the Qualification Amendment created a new class of shares and that its adoption thereby violated Utah Code § 16-6a-1004, which provides that any amendment that creates a new class of shares must be adopted separately by each of the classes it creates. The Tribe also claimed that the Amendments were unreasonable as a matter of law because they impinged on the Tribe's voting rights, unlawfully entrenched the board of directors, and, in particular, the Qualification Amendment was arbitrary and overbroad. The Tribe further claimed that, by adopting the Amendments, the UDC directors violated the covenant of good faith and fair dealing with the Tribe.

The UDC filed its own motion for summary judgment on the same day, addressing the same issues that the Tribe raised in its motion. The district court ruled on the motions on March 12, 2010.

The court started by reviewing the history of the parties' relationship and found that "the Ute Tribe and the UDC have on-going and serious conflicting interests." *Ute Indian Tribe v. Ute Distrib. Corp.*, No. 2:06-cv-557 CW, 2010 WL 956905 at *3 (D. Utah March 12, 2010) (unpublished). The court also stated that it was "evident from the

7

record that the potential for such conflicts is inherent in the different interests of the shareholders of the UDC and the Ute Tribe." *Id.* at \*6.

The district court held that (1) the Qualification Amendment was a reasonable means to ensure the corporate loyalty of UDC directors given the conflict of interest between the Tribe and the UDC, *see id.*; (2) the Qualification Amendment did not create a new class of shares because it applied to every shareholder and did not affect the Tribe's voting rights, *see id.* at \*7; (3) the Power Amendment and the Cause Amendment were reasonable, *see id.* at \*7-8; and, (4) the business judgment rule shielded the UDC directors from the Tribe's good faith and fair dealing claim, *see id.* at \*8.

The court granted the UDC's motion for summary judgment and denied the Tribe's motion. *See id.* at \*9. The Tribe moved for reconsideration, arguing that the district court had improperly applied the standard for summary judgment by relying on disputed facts and misapplying state law. On November 4, 2010, the district court denied the motion to reconsider.

The Tribe filed a timely appeal of the district court's ruling. After oral argument, we ordered supplemental briefing on the issue of subject matter jurisdiction.

## II. DISCUSSION

We begin by addressing the threshold question of whether the district court had jurisdiction over the case. After discussing the standard of review, we turn to the Qualification Amendment and the Tribe's arguments that it created a new class of shares and that it was unreasonable as a matter of law. We then analyze the reasonableness of

8

the other Amendments and the Tribe's good faith and fair dealing claim. We conclude by responding to the Tribe's argument that the district court improperly relied on disputed facts.

## A. *Jurisdiction*

We address three potential bases for the district court's subject matter jurisdiction: (1) federal question jurisdiction based on the Partition Act, (2) removal jurisdiction under 28 U.S.C. § 1442, and (3) supplemental jurisdiction based on the Tribe's subsequently withdrawn Civil Rights Act claim. We reject the first two bases for jurisdiction, but conclude that the district court had discretion to exercise supplemental jurisdiction over the Tribe's state law claims because it had original jurisdiction over the Civil Rights Act claim.

In its supplemental briefing, the UDC argued that the Tribe lacked Article III standing on the ground that "the Tribe failed to show an injury in fact since the Tribe itself was not harmed because the Tribe itself could never be a director." Aple. Supp. Br. at 9. We disagree and hold that the Tribe has standing to raise its claims.

### 1. *No Federal Question Jurisdiction Based on the Partition Act*

Congress has provided that federal "district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. The Supreme Court recently reiterated that "a suit 'arises under' federal law only when the plaintiff's statement of his own cause of action shows that it is

based upon federal law." *Vaden v. Discover Bank*, 556 U.S. 49, —, 129 S. Ct. 1262, 1272 (2009) (quotations omitted).

For a plaintiff's claim to "arise under" federal law, "[t]he plaintiff's well-pleaded complaint must establish either that federal . . . law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal . . . law." *Holmes Grp. v. Vornado Air Circulation Sys.*, 535 U.S. 826, 830 (2002) (quotations omitted).

In the initial round of briefing on appeal, the Tribe contended that the claims in this case "arise under" the Partition Act. In its notice of removal, the UDC stated that "[t]he relationship of the parties is governed by the Ute Partition Act" and the complaint therefore "alleges a violation of that federal statute." Joint App. Vol. I at 18.

Leaving aside for the moment the Civil Rights Act claim, the Tribe's claims do not "arise under" federal law. The Partition Act does not create the cause of action for the Tribe's claims. The complaint alleged three claims. First, the Qualification Amendment was adopted in violation of Utah Code § 16-6a-1004. Second, all three Amendments were unreasonable as a matter of Utah law. Third, the UDC directors violated the duty of good faith and fair dealing under Utah law. Utah law, not federal law, creates the cause of action for each of these claims.

The Tribe's right to relief on these claims does not depend on resolving a substantial question of federal law. The Partition Act helps to explain the relationship between the Tribe and the UDC and their joint management of the indivisible assets, but

10

the Tribe does not rely on the Partition Act to prevail on its state law claims. The UDC defends the Qualification Amendment in part on the ground that it was reasonable to protect corporate loyalty given the inherent conflict between the Tribe and the UDC that the Partition Act creates. But a federal statute that provides an explanation for a defense is not part of a plaintiff's well-pleaded complaint, and we have not been asked to resolve a substantial question of federal law.

We hold that the district court did not have federal question jurisdiction over the Tribe's state law claims based on the Partition Act.

### 2. *No Removal Jurisdiction under 28 U.S.C. § 1442*

In its notice of removal, the UDC offered an alternative basis for jurisdiction: "[T]he UDC has been appointed by the United States as the representative of the Mixed-Blood Group of the Ute Indian Tribe in all matters relating to undistributed Tribal assets, and hence, this action may be removed to this Court pursuant to 28 U.S.C. §§ 1442(a)(1), 1442(b)(2)." Joint App. Vol. I at 18.

Title 28 U.S.C. § 1442(a)(1) provides that removal is proper when a suit is filed against "[t]he United States or any agency thereof or any officer . . . thereof . . . for any act under color of such office or on account of any right . . . claimed under any Act of Congress." The UDC is not an agency or an officer of the United States. The Partition Act provides for "authorized representatives who shall have power to take any action that is required by this subchapter to be taken by the mixed-blood members as a group." 25 U.S.C. § 677e. The UDC is a representative of the mixed-bloods, not of the United

11

States.

The Tribe's removal order also referred to 28 U.S.C. § 1442(b)(2). No such subsection exists. *See* 28 U.S.C. § 1442(b). The Tribe likely meant to refer to 28 U.S.C. § 1442(a)(2), which provides for removal jurisdiction when a suit is filed against "[a] property holder whose title is derived from any such officer, where such action or prosecution affects the validity of any law of the United States." The UDC jointly holds title to assets with the Tribe, and that title is derived from a federal officer, the Secretary of the Interior. *See* 25 U.S.C. § 677h. But the Tribe's state law claims do not affect "the validity of any law of the United States." As we explained above, one of the UDC's defenses might at most implicate the interpretation of a federal statute, not its validity. The existence of the property rights shared between the Tribe and the UDC is not at issue in this case.

We hold that 28 U.S.C. § 1442 did not create removal jurisdiction over the Tribe's state law claims.

### 3. *Supplemental Jurisdiction Based on the Civil Rights Act Claim*

When this case was removed to federal court, the Tribe's complaint included a claim that the UDC had discriminated against full-blood Utes on the basis of race in violation of the Civil Rights Act, 42 U.S.C. § 1981. The UDC stated in its notice of removal that the Civil Rights Act claim gave the district court subject matter jurisdiction over the case. In their supplemental briefing, both parties now argue that the district

12

court had supplemental jurisdiction over the Tribe's state law claims because it had original jurisdiction over the Civil Rights Act claim. We agree.

Federal district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). The Civil Rights Act claim formed part of the same case or controversy as the Tribe's Utah corporate law claims.[6]

The Tribe voluntarily withdrew the Civil Rights Act claim during the discovery phase of the litigation. Under 28 U.S.C. § 1367(c), "district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." The Supreme Court has stated that "[a] district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, —, 129 S. Ct. 1862, 1866 (2009). "[T]he district court's exercise of its discretion under § 1367(c) is not a jurisdictional matter.

---

[6] We recognize that, "if a federal claim is too insubstantial to invoke federal question jurisdiction for the underlying case, . . . there can be no supplemental jurisdiction of other claims." 13D Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 3567. The Tribe's Civil Rights Act claim overcomes that hurdle. Even if pretrial discovery raised doubt about the Civil Rights Act claim, when the pleadings were filed and the case was removed the claim was not so "'wholly insubstantial and frivolous'" that it failed to invoke the jurisdiction of the district court. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)).

13

Thus, the court's determination may be reviewed for abuse of discretion, but may not be raised at any time as a jurisdictional defect." *Id.* at 1867 (quotations omitted).

Neither party challenges the district court's implicit decision to retain jurisdiction over the Tribe's Utah corporate law claims. We therefore hold that the district court properly exercised supplemental jurisdiction over the Tribe's claims.

**4.** *The Tribe Has Article III Standing to Raise its Claims*

The UDC argues that the Tribe lacks Article III standing to raise its claims. To establish Article III standing, a plaintiff must establish (1) that he or she has "suffered an injury in fact;" (2) that the injury is "'fairly traceable to the challenged action of the defendant;" and, (3) that it is "likely" that "the injury will be redressed by a favorable decision." *Ariz. Christian Sch. Tuition Org. v. Winn*, 131 S. Ct. 1436, 1442 (2011) (quotations omitted); *see also Jordan v. Sosa*, 654 F.3d 1012, 1019 (10th Cir. 2011).

The UDC disputes whether the Tribe has met the first element, injury in fact. An injury in fact is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *See Winn*, 131 S. Ct. at 1442 (quotations omitted). The UDC claims that "the Tribe failed to show an injury in fact since the Tribe itself was not harmed because the Tribe itself could never be a director." Aple. Supp. Br. at 9.

The UDC's argument speaks more to the merits rather than standing. As we have said, "[w]e do not address the merits of plaintiff's claims in our determination of standing because the fundamental aspect of standing is that it focuses on the party seeking to get

14

his complaint before a federal court and not on the issues he wishes to have adjudicated." *Buchwald v. Univ. of New Mexico Sch. of Med.*, 159 F.3d 487, 493 (10th Cir. 1998) (quotations omitted). Each of the Tribe's claims satisfies the injury-in-fact requirement. We address them in turn.

The Tribe's first claim is that the Qualification Amendment was adopted in violation of Utah Code § 16-6a-1004, which provides that an amendment which creates a new class of shares entitles the shareholders in each class to vote on that amendment as a separate voting group. The Tribe contends that the Qualification Amendment put it into a new class of shares and that it was injured by being deprived of its right under Utah law to vote on that amendment as a separate voting group.

The Tribe's second claim is that all three Amendments were unreasonable as a matter of Utah law. The Tribe contends that it was injured because the Amendments diminished its shareholder power.

The Tribe's third claim is that the UDC directors violated the duty of good faith and fair dealing under Utah law. As a shareholder, the Tribe had a contract with the UDC, *see Workman v. Brighton Prop., Inc.*, 976 P.2d 1209, 1212 (Utah 1999), which created a covenant of good faith and fair dealing between the UDC and the Tribe. The Tribe contends that the UDC directors proposed the Amendments with intent to cause the Tribe to "lose [its] voting rights." Joint App. Vol. I at 30. The Tribe's alleged injury was deprivation of voting rights and diminishment of shareholder power.

15

The alleged Article III injuries under each claim were sufficient to confer standing. Whether the Tribe's claims were meritorious is a separate issue that we turn to next.[7]

\* \* \*

Because the district court had jurisdiction over the Tribe's claims, we have jurisdiction to review the court's final judgment under 28 U.S.C § 1291.

## B. *Standard of Review*

This appeal reviews the district court's denial of the Tribe's motion for summary judgment and the court's grant of the UDC's motion. "We review summary judgment decisions de novo, applying the same legal standard as the district court." *Tuckel v. Grover*, 660 F.3d 1249, 1251 (10th Cir. 2011) (quotations omitted).

Summary judgment is granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a district court's ruling on a motion for summary judgment, "we must view evidence in the light most favorable to the non-moving party." *Tuckel*, 660 F.3d at 1251.

---

[7] Courts have reached the merits of shareholder claims that an amendment created a new class, *see, e.g., Lake Arrowhead Chalets Timeshare Owners Ass'n v. Lake Arrowhead Chalets Owners Ass'n*, 59 Cal. Rptr. 2d 875, 876-77 (Cal. Ct. App. 1996), or was unreasonable as a matter of law, *see, e.g., Dozier v. Auto. Club of Michigan*, 244 N.W. 2d 376, 384 (Mich. App. 1976); *McKee & Co. v. First Nat. Bank of San Diego*, 265 F. Supp. 1, 3-4 (S.D. Cal. 1967).

## C. *Qualification Amendment*

The Tribe's main challenge is to the Qualification Amendment. It contends that the Qualification Amendment created a new class of shares, thus triggering the requirement under Utah law that each class of shares vote separately on an amendment. It also argues that the Qualification Amendment was unreasonable as a matter of law.

### 1. *No Creation of a New Class*

Utah's Nonprofit Corporation Act provides that

> the members of a class who are entitled to vote are entitled to vote as a separate voting group on an amendment to the articles of incorporation if the amendment would: (a) affect the rights, privileges, preferences, restrictions, or conditions of that class as to voting, dissolution, redemption, or transfer of memberships in a manner different than the amendment would affect another class . . . or (f) authorize a new class of memberships.

Utah Code Ann. § 16-6a-1004(1). It also provides that: "If a class is to be divided into two or more classes as a result of an amendment to the articles of incorporation, the amendment shall be approved by the members of each class that would be created by the amendment." *Id.* § 16-6a-1004(2).

The Tribe contends that the Qualification Amendment, by prohibiting Tribe affiliates from being nominated for or serving on the board of directors, created a new class of shares, which triggered the separate voting group requirement.

The UDC has never had more than one class of shares. The Qualification Amendment makes no reference to classes of shares. The Tribe's claim appears to be

17

that the Amendment created a new implicit or de facto class of shares.[8]

The Qualification Amendment did not create an explicit class. Utah Code § 16-6a-1004 does not contemplate implicit classes. Section 16-6a-1004(1) refers not only to explicit classes, but to *preexisting*, explicit classes. Its prefatory clause speaks of "the members of a class who *are* entitled to vote." *See id.* Therefore, each of § 16-6a-1004(1)'s subsections—including subsection (a), which refers to amendments that would "affect . . . the rights . . . of that class as to voting"—applies to preexisting, explicit classes. *See* Utah Code Ann. § 16-6a-1004(1)(a).

Moreover, the purpose of separate voting group requirements is to protect explicit classes. As one leading treatise explains, "[t]he right to vote as a separate voting group is a prime protection for classes or series of shares with preferential rights or classes or series of limited or nonvoting shares against amendments that are detrimental to that class." 7A William Meade Fletcher, Cyclopedia of the Law of Corporations § 3719.20.

We doubt that § 16-6a-1004(2)'s reference to a class "created by the amendment" contemplates implicit classes, but we need not decide this issue. Even if we were to accept the Tribe's theory of implicit classes, we would still need to be persuaded that the

---

[8] The Tribe cites *Howe v. Washington Land Yacht Harbor, Inc.*, 459 P.2d 798 (Wash. 1969), which provides a useful contrast to this case. In *Howe*, the Washington State Supreme Court held that an amendment to a nonprofit corporation's bylaws that explicitly created a class of membership that was not eligible to vote on certain issues violated a state statute prohibiting members of nonprofit corporations from acquiring more voting power than other members. *Id.* at 806. The Qualification Amendment does not create an explicit class and does not restrict Tribe-affiliated shareholders from voting on any issue.

Qualification Amendment created a new implicit class. The Tribe argues that the Amendment created such a class because it affected the voting rights of Tribe-affiliated shareholders. We are not persuaded. Section 16-6a-1004's sole reference to amendments that "affect . . . the rights . . . of that class as to voting" § 16-6a-1004(1)(a), applies to preexisting classes, and the Qualification Amendment does not prevent any UDC shareholders from voting for qualified director candidates.

The Tribe offers two arguments for its position. First, it claims the Qualification Amendment created a class of shares belonging to shareholders who may not serve, or be nominated to serve, as directors. Second, it claims the Amendment created a class of shares belonging to shareholders who may not "nominate a candidate of [their] choice" to the board of directors. Aplt. Br. at 26. We disagree with both arguments.

### a. *No Class Based on Ineligibility to Serve as a Director*

The Tribe's first argument would render the separate voting group requirement, Utah Code § 16-6a-1004, inconsistent with Utah Code § 16-6a-802, which provides that corporations "may prescribe other qualifications for directors in addition to the requirements" in the statute that directors be natural persons and at least 18 years old.

The Utah Supreme Court has said that, under its "rules of statutory construction, we must give effect to every provision of a statute and avoid an interpretation that will render portions of a statute inoperative. To achieve this goal, we construe the provision at issue with every other part or section so as to produce a harmonious whole." *Warne v. Warne*, — P.3d —, 2011 WL 5155648 at *8 (Utah 2011) (quotation and citations

19

omitted).

Under the Tribe's reasoning, any time a corporation seeks to add a director qualification, the group of shareholders who would become disqualified from serving as directors would need to vote on the qualification requirement as a separate voting group. They would almost certainly vote against an amendment preventing them from serving as directors, causing the amendment to fail. *See* Utah Code Ann. § 16-6a-1004(2) (requiring that, when the separate voting group provision is triggered, "the amendment shall be approved by the members of each class that would be created by the amendment."). The Tribe's argument, therefore, would undermine Utah Code § 16-6a-802's provision that corporations may prescribe additional qualifications for director because in most instances it would be difficult if not impossible to alter the qualifications for board membership.

Thus, we must reject the Tribe's argument that the Qualification Amendment created a new class of shares because certain shareholders have become ineligible to serve as UDC directors.

### b. *No Class Based on Inability to Nominate Tribe Affiliates*

The Tribe's second argument also fails. The Tribe claims that the Qualification Amendment created a new class of shares belonging to shareholders who may not "nominate a candidate of [their] choice" to the board of directors. Aplt. Br. at 26. But the Qualification Amendment does not prevent only the Tribe from nominating Tribe affiliates to be directors. It prevents *every* UDC shareholder from nominating Tribe

20

affiliates to be directors.  Each shareholder remains on equal footing to nominate anyone who meets the qualifications to be a director.  Accordingly, there is no separate class of shares.

Furthermore, the group of UDC shareholders who might want to nominate a Tribe-affiliated candidate for a director position is not a definable class.  As the district court reasoned, "a particular mixed-blood shareholder, for example, may believe a member of the Ute Tribe would best represent his or her interests on the board.  The amendments preclude such a shareholder from nominating that person just as it does the Ute Tribe." *Ute Indian Tribe*, 2010 WL 956905 at *7.  Conversely, the Tribe might want to nominate someone who was not affiliated with the Tribe.  The Tribe cannot point to a discrete group of shareholders whom the Qualification Amendment deprives of the right to nominate a candidate of their choice.

There are, of course, limits on what qualifications corporations may require to be a director, but that is a separate issue from whether the Qualification Amendment creates a new class of shares.

We reject the Tribe's argument that the Qualification Amendment created a new class of shares by preventing shareholders from nominating Tribe-affiliated directors.

* * *

The Tribe also draws our attention to *Lake Arrowhead*.  In that case, a condominium association adopted a bylaw amendment providing that timeshare owners could only vote for three seats on the board of directors, while condominium owners

21

could vote for four seats. 59 Cal. Rptr. 2d at 877. The California Court of Appeals held that the amendment triggered the California Corporate Code's provision that required each class to vote on an amendment that created a new class and therefore was invalidly adopted. *Id.* at 877-78.

*Lake Arrowhead* demonstrates that, even if we were to accept the Tribe's implicit class theory, the Tribe would be unable to establish that the Qualification Amendment created a new class. The amendment in *Lake Arrowhead* identified a discrete group of shares—shares held by timeshare owners—and restricted the voting rights of those shares. *Id.* at 877. The Qualification Amendment, unlike the bylaw amendment in *Lake Arrowhead*, does not identify a discrete group and does not affect voting rights.

We hold that the Qualification Amendment did not create a new class of shares and, therefore, did not trigger the separate voting group requirement under Utah Code § 16-6a-1004. It was therefore adopted in compliance with this statute.

### 2. *Reasonableness*

The Tribe also challenges the Qualification Amendment as unreasonable.[9]

We agree with the parties that reasonableness is a question of law. In reviewing a bylaw that required that directors of a bank have no affiliation with other banks, a federal

---

[9] Many courts reviewing qualification requirements for directors are presented bylaws rather than articles of incorporation. *See, e.g., McKee*, 265 F. Supp. at 3; *Durkin v. Nat'l Bank of Olyphant*, 772 F.2d 55, 60 (3d Cir. 1985). We see no relevant difference in where the qualifications are listed because "[i]t is undoubtedly within the power of a corporation to prescribe by bylaw or the articles of incorporation the qualifications of its directors." 2 Fletcher, Cyclopedia § 298.

22

district court explained that the issue was "purely a question of law." *McKee*, 265 F. Supp. at 4. A leading treatise agrees that, "[g]enerally speaking, whether a particular bylaw is invalid because it is unreasonable presents a question of law for the court." 8 Fletcher, Cyclopedia § 4191.

A bylaw or article of incorporation is not unreasonable simply because a court disagrees with it. "Where the reasonableness of a by-law is a mere matter of judgment, and one upon which reasonable minds must necessarily differ, a court would not be warranted in substituting its judgment instead of the judgment of those who are authorized to make by-laws and who have exercised their authority." *McKee*, 265 F. Supp. at 4 (quotations omitted); *see also* 8 Fletcher, Cyclopedia § 4191.

In this case, the district court held that the Qualification Amendment was reasonable to ensure the corporate loyalty of UDC directors. On appeal, the Tribe contests the corporate loyalty rationale because the district court could only reach this conclusion by relying on the UDC's factual claim—which the Tribe disputes—that the UDC and the Tribe are embroiled in serious and ongoing conflicts.

The UDC does not need to prove its view of the facts for us to hold that the Qualification Amendment was reasonable. Director qualification requirements may be based on the *potential* for a conflict of corporate loyalty. *See, e.g., McKee*, 265 F. Supp. at 7. The Tribe concedes that before the adoption of the Amendments, "there had been several points of friction between the Tribe and the UDC." Aplt. Br. at 10. It cannot

credibly maintain that there is no potential for future conflict between the Tribe and the UDC.

A long history of cases holds that corporations can require that directors be free of any potential conflict of interest. Two of the famous early cases are *Cross v. West Virginia. Cent. & Pittsburgh Ry. Co.*, 16 S.E. 587, 588 (W.Va. 1892), which upheld a requirement that a director could not be an attorney in a suit against the corporation, and *People ex rel. Wildi v. Ittner*, 165 Ill. App. 360, 369 (1911), which upheld a requirement that a director could not "be an officer, agent, employee, attorney or trustee in any other firm" in the industry. *Id.* at 362.

We find *McKee* to be particularly instructive. In *McKee*, the court upheld a requirement that "no director should be an attorney for, or connected with other banking institutions." 265 F. Supp. at 3. The *McKee* court upheld the qualification requirement even though "[t]here [wa]s lack of any showing that . . . [the] plaintiff's nominees . . . would not have been loyal directors." *Id.* at 4.

The Tribe attempts to distinguish *McKee* because the First National Bank was trying to protect against directors working for competing businesses whereas the Tribe and the UDC are "joint owners," not competing businesses. Aplt. Br. at 37.[10] But the

---

[10] The Tribe also points to *Dozier*, in which the Michigan Court of Appeals held unreasonable a bylaw that non-management candidates for the board of directors, but not management candidates, needed to secure the signatures of one-half of one percent of the club's members to qualify. 244 N.W. 2d at 381-82, 385. Unlike the bylaw in *Dozier*, the Qualification Amendment does not affect the process of election and does not give any

Continued . . .

Tribe and the UDC need not be competing businesses to have the potential for conflicts of interest. The Partition Act anticipates the potential that the Tribe might not represent the interests of mixed-bloods by providing that the mixed-bloods may "organize for their common welfare." 25 U.S.C. § 677e. The Partition Act also recognizes the potential for conflict by including a provision for handling disputes between the two groups titled "Procedure by Secretary upon non-agreement between mixed-blood and full-blood groups." 25 U.S.C. § 677aa.

The Tribe relies primarily on two cases for its position that the Qualification Amendment was an unreasonable restriction on what the Tribe calls its right to nominate a candidate of its choice to be a UDC director. It first cites to *Durkin*, which undercuts, rather than supports, the Tribe's position. In *Durkin*, the court held that "the voting rights [that the National Bank Act of 1864, 12 U.S.C. § 61,] guarantees include the right to nominate candidates for directorships." 772 F.2d at 58. But in the same opinion, the court upheld "a by-law prohibiting shareholders whose spouses are affiliated with another bank from serving as directors" of a bank. *Id.* at 60. Accordingly, *Durkin* supports our conclusion that corporations may limit a shareholder's choice of director nominees to those candidates who meet the relevant qualifications, which may include requirements that protect corporate loyalty.

---

Cont.

advantage to the candidates of any particular group. It only requires that candidates not be Tribe affiliates.

25

Another case on which the Tribe relies, *AHI Metnall, L.P. v. J.C. Nichols Co.*, 891 F. Supp. 1352 (W.D. Mo. 1995), stands for the same limited proposition as *Durkin*. In *Metnall*, a federal district court granted a preliminary injunction stating that "the rights to nominate director candidates and propose business are integral components of a shareholder's right to vote" and invalidated a requirement that only shareholders possessing 20% or more of the shares could nominate director candidates. *Id.* at 1356-58. The *Metnall* Court explained that "these bylaw amendments effectively preclude Plaintiff or any other shareholder from nominating a director or proposing any business at shareholder meetings." *Id.* at 1356. As we explained above, the Qualification Amendment does not preclude the Tribe from nominating UDC directors. It precludes all shareholders only from nominating Tribe affiliates to be directors.

The Tribe also argues that the Qualification Amendment is overbroad. The Qualification Amendment excludes from the UDC board of directors individuals who are "employed in a full-time or part-time capacity, with or without compensation" by the Tribe or "serving [the Tribe] in a consulting or advisory capacity, whether directly or indirectly, paid or unpaid, on a full or part-time basis." Joint App. Vol. I at 88.

The question before us is not whether the Qualification Amendment was narrowly tailored to the UDC's purpose. All we need to decide is whether the Amendment was reasonable. It is not unreasonable for the UDC to be concerned about divided loyalty as to all Tribe affiliates. For example, as the district court noted, a broad requirement that directors not be affiliated with an organization that could create a conflict of interest

26

helps to protect confidential information. *See Ute Indian Tribe*, 2010 WL 956905 at *6.

In *McKee*, "in addition to the direct conflict or potential conflict of interest, there [wa]s also the danger of inadvertent leakage of confidential information through casual office discussions or accessibility of files." 265 F. Supp. at 7. The *McKee* court held that the directors reasonably "determined that [the organization's] welfare was best protected if this opportunity for conflicting loyalties and potential misuse and leakage of confidential information was foreclosed." *Id.*

In a more recent case, *eBay Domestic Holdings, Inc. v. Newmark*, 16 A.3d 1 (Del. ch. 2010), the Delaware Court of Chancery relied on reasoning similar to the *McKee* court. In response to perceived competition from eBay, the directors and controlling shareholders of Craigslist adopted a series of amendments to its corporate charter and bylaws that staggered board elections to cut off eBay, a Craigslist shareholder, from unilaterally placing a director on Craigslist's board. *Id*. at 22-23. The Court of Chancery held that "[p]reventing a competitor that is also a minority stockholder from unilaterally placing a director on the board so that confidential corporate information will not be freely shared with that competitor is a legitimate and rational business purpose." *Id.* at 40-41.

The Tribe responds to the UDC's information leakage argument by asserting that "as joint manager of the indivisible assets, [it] already has access to confidential business information regarding the joint assets." Aplt. Br. at 39. But to the extent that the UDC disagrees with the Tribe about the joint management and wishes to have internal strategy

27

discussions about how to advance its interests, the UDC has a reasonable concern that Tribe-affiliated directors would intentionally or even inadvertently disclose confidential information from those discussions to the Tribe. This court may not "substitut[e] its judgment" for the judgment of the UDC shareholders in determining that the Qualification Amendment was a reasonable means to protect the UDC board's confidentiality. *See McKee*, 265 F. Supp. at 4 (quotations omitted).

We hold that the Qualification Amendment is a reasonable means to ensure that UDC directors will not have a potential conflict of interest or disclose any confidential information by virtue of their affiliation with the Tribe.

## D. *Other Amendments*

The Tribe also challenges the reasonableness of the Power and Cause Amendments as a matter of law.

### 1. *Reasonableness of the Power Amendment*

The Power Amendment modified the provision in the Articles of Incorporation governing who could exercise the UDC's corporate powers. Before the Amendment, the Articles stated: "The Board of Directors shall exercise the corporate powers of the corporation." Joint App. Vol. I at 75. The new version states: "The exercise of the corporate powers of this corporation shall be vested exclusively in its duly elected Board of Directors. The stockholders shall not exercise any corporate power unless requested to do so in a written resolution adopted by the Board of Directors and submitted to the stockholders for approval." *Id.* at 89-90.

28

The Tribe claims that the Power Amendment diminishes shareholder power. But as the district court correctly concluded, the Power Amendment expands rather than diminishes the power of shareholders. *See Ute Indian Tribe*, 2010 WL 956905 at *7. Before the Power Amendment, the UDC Articles did not allow for anyone but the board to exercise corporate powers. As Utah courts have held, "'[s]hall' is generally presumed to indicate a mandatory requirement." *Southwick v. Southwick*, 259 P.3d 1071, 1074 (Utah 2011) (quotations omitted). If the board must exercise the UDC's corporate powers, no other entity may exercise them. Utah courts also apply the *expressio unius est exclusio alterius* canon, the rule that when the law "expressly provides the manner of doing a thing, it impliedly forbids it being done in a substantially different manner." *Salt Lake City v. Ohms*, 881 P.2d 844, 856 (Utah 1994).

Before the Power Amendment, the UDC board of directors had no choice but to exercise corporate powers itself. The Power Amendment's addition of "exclusively" was simply a clarification. The only meaningful change the Power Amendment made was to allow the board to delegate the exercise of corporate powers with a written resolution.

On appeal, the Tribe claims that the Power Amendment, "in a backdoor fashion so slick it escaped the notice of the district court . . . prevent[ed] shareholders from proposing any corporate action without prior Board consent," thereby "silenc[ing] the voices" of UDC shareholders. Aplt. Br. at 34. But the Power Amendment only states that the shareholders shall not "exercise" any corporate power without a written

29

resolution from the board. The Power Amendment places no limitation on what shareholders may propose. It does not, as the Tribe claims, silence shareholders.

We hold that the Power Amendment is reasonable as a matter of law.

### 2. *Reasonableness of the Cause Amendment*

The Cause Amendment states that UDC shareholders may remove a director only upon a showing of cause and then defines what constitutes cause. Utah Code § 16-6a-808(1)(a) permits such a requirement by providing that nonprofit corporations may "provide that directors may be removed only for cause."

The Tribe concedes that "such a clause may be permissible under Utah Code Ann. § 16-6a-808(1)(a) if properly adopted." Aplt. Br. at 34. But the Tribe then offers the quixotic argument that the Cause Amendment, "considered conjunctively with [the Power Amendment], prevents UDC shareholders from seeking the removal of individual directors *for cause* without first obtaining the Board's prior written approval." *Id.* (emphasis in original).

Even if the Tribe's argument were correct, its argument would be against the Power Amendment, not the Cause Amendment. The argument also misunderstands the Amendments. The Power Amendment only requires prior written approval for shareholders to exercise the UDC's corporate powers. Removing a UDC director is not an exercise of corporate power. The Cause Amendment expressly provides that "Removal of a member of the Board of Directors for cause shall require a two-thirds (2/3) vote of the stock represented at any annual meeting of the stockholders or at any

30

special meeting thereof called for that purpose." Joint App. Vol. I at 89. There is no requirement that the shareholders obtain written approval from the board.

We hold that the Cause Amendment is reasonable as a matter of law.

### E. *Good Faith and Fair Dealing Claim*

In addition to its claim that the Amendments were unreasonable and adopted in violation of Utah law, the Tribe claims that the individual UDC directors violated the covenant of good faith and fair dealing.

Utah law allows shareholders to sue for violation of the covenant of good faith and fair dealing. The Utah Supreme Court explained, "[i]t is well established precedent that the bylaws of a corporation, together with the articles of incorporation, the statute under which it was incorporated, and the [shareholder's] application, constitute a contract between the [shareholder] and the corporation." *Workman,* 976 P.2d at 1212 (quotation omitted).

A covenant of good faith and fair dealing exists between UDC shareholders and the UDC. The Utah Supreme Court has held that "[a]n implied covenant of good faith and fair dealing inheres in every contract." *Eggett v. Wasatch Energy Corp.*, 94 P.3d 193, 197 (Utah 2004). "Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract." *Id.*

The Tribe's claim is against the UDC's individual directors. A claim against individual directors is generally barred in Utah because "a contract between a member

31

and a corporation is not a contract between a member and those individuals who direct or manage the corporation." *Reedeker v. Salisbury*, 952 P.2d 577, 582 (Utah App. 1998). In Utah, "[t]he general rule is that a corporation is an entity separate and distinct from its officers, shareholders and directors and that they will not be held personally liable for the corporation's debts and obligations." *Id.* (quotations omitted).

But when a director acts in bad faith, the director can become liable for a corporation's breach of contract. *See id.* ("[A] director is not personally liable for his corporation's contractual breaches unless he assumed personal liability, acted in bad faith or committed a tort in connection with the performance of the contract." (quotations omitted)).

The Tribe claims that the UDC board of directors intentionally violated its right to benefit from its shareholder contract by proposing and overseeing the adoption of the Amendments.

The district court analyzed this issue by applying the venerable business judgment rule, which creates a presumption that directors will not be held liable for their actions as directors. *See Ute Indian Tribe*, 2010 WL 956905 at *8; *see also Aronson v. Lewis*, 473 A.2d 805 (Del. 1984) (explaining the business judgment rule), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); 3A Fletcher, Cyclopedia § 1036. The Tribe contends that the business judgment rule does not apply to this case. We need not resolve this issue because whether the business judgment rule applies makes no

difference to the question before us.[11] The Delaware Court of Chancery has explained that a "plaintiff can rebut the business judgment presumption . . . by showing that the majority of directors who approved the action . . . did not act in good faith in approving the action." *eBay*, 16 A.3d at 36. So regardless of whether the business judgment rule applies, the Tribe's claim hinges on whether the UDC directors acted in bad faith.

Our earlier holdings in this case preclude the Tribe's claim. We have held that the Amendments were legally adopted and that each Amendment was reasonable as a matter of law. The Tribe cannot prove that the UDC board of directors acted in bad faith when the directors proposed reasonable amendments and oversaw a shareholder vote that adopted amendments in compliance with Utah law. The Amendments did not deprive the Tribe of the benefits of the shareholder contract.

We hold that the district court did not err in granting summary judgment to the UDC on the Tribe's good faith and fair dealing claim.

## F. *No Reliance on Disputed Facts*

The Tribe argues that the district court, in its summary judgment ruling, improperly relied on disputed facts. In particular, the Tribe points to the court's statement that the UDC had presented "'substantial evidence supporting a rational concern that there have been and continue to be conflicts of interest between the Ute

---

[11] "[W]e are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *Harman v. Pollock*, 586 F.3d 1254, 1259 (10th Cir. 2009) (quotations omitted).

Tribe and the UDC.'" Aplt. Br. at 49 (quoting *Ute Indian Tribe*, 2010 WL 956905 at \*6).

But the district court emphasized that its ruling was based on its legal conclusion that "the potential for such conflicts is inherent in the different interests of the shareholders of the UDC and the Ute Tribe." *Ute Indian Tribe*, 2010 WL 956905 at \*6. The potential for conflicts between the Tribe and the UDC does not hinge on facts about particular past or present conflicts between them. The potential for conflict is evident in the UDC's purpose as explained in its Articles of Incorporation and in the Partition Act. Moreover, as we explained above, the Tribe's concession that "there had been several points of friction between the Tribe and the UDC" undercuts the Tribe's ability to contend that there is no potential for conflict. *See* Aplt. Br. at 10.

We hold that the district court did not improperly rely on disputed facts in granting summary judgment for the UDC.

### III. CONCLUSION

We hold that the Amendments to the UDC Articles of Incorporation did not create a new class of shares and were reasonable as a matter of law. We also hold that the UDC board of directors did not violate the covenant of good faith and fair dealing and that the district court did not rely on any disputed material facts. We affirm the district court's grant of the UDC's motion for summary judgment and its denial of the Tribe's motion for summary judgment.

The Tribe moved to strike the UDC's Supplemental Appendix and portions of the UDC's Answer Brief on the ground that material in the Supplemental Appendix on which

the UDC relied in its Answer Brief was never made part of the record before the district court.  The Tribe also requested sanctions and attorney fees.  We do not understand the legal issues before us to require us to resolve any factual dispute and therefore we need not consider the Supplemental Appendix.  We therefore dismiss the Tribe's motion to strike as moot.  We accordingly dismiss the motion for sanctions and attorney fees.

After filing its Supplemental Brief on jurisdiction, the Tribe moved to file a Supplemental Appendix of its own to support some of the factual claims in its Supplemental Brief.  Because the jurisdictional issue in this case does not require us to resolve any factual questions, we dismiss the Tribe's motion to file a Supplemental Appendix as moot.